DONALD JORDAN, Appellee, v. BRADY TRANSFER & STORAGE COMPANY, Appellant.

No. 44492.

138

FEBRUARY 7, 1939.

REHEARING DENIED JUNE 23, 1939.

Helsell, Burnquist, Bradshaw & Dolliver, for appellee.

Miller, Miller & Miller and Mitchell & Loth, for appellant.

BLISS, J.—Appellant has described this action as ''an attempt to upset a settlement''. The appellee was injured on August 22, 1935, when an automobile, parked partly on a paved

highway, in which he was seated as a guest, was struck by a truck of the defendant.

The petition contained the allegations usual to the statement of a cause of action for personal injuries received through the alleged negligence of a defendant under such circumstances. In the first division of its answer, the defendant denied generally, and in the second division, it alleged that the plaintiff was barred from recovery because the plaintiff, on September 20, 1935, had accepted $530.80 in full settlement of his damages, and had executed and delivered to defendant a covenant not to sue it or its driver, in consideration of the payment. In his reply the plaintiff admitted execution of this instrument, and the receipt of the sum stated, for which credit was given in his petition, but alleged that the instrument never became binding because of the mutual mistake of the parties in its execution. In an amendment to his reply, the plaintiff tendered to the defendant the $530.80 he had received, and renewed the tender in open court at the close of all the evidence. The defendant refused the tender for the stated reason that it was not a legal tender, and came too late.

At the close of the evidence the defendant filed and argued a motion for a directed verdict in its favor on the following grounds (Exhibit 1 referred to was the covenant not to sue.):

"Motion for a Directed Verdict.

"The defendant moves the Court at the close of the evidence to direct a verdict in favor of the defendant on each of the following grounds:

"1. That as the record now stands, Exhibit 1 of the evidence is a complete defense to the plaintiff's claim, and that there is no evidence competent, sufficient, or admissible, to overcome the effect of Exhibit 1 as such defense.

"2. That there is no evidence of the alleged mistake upon which plaintiff relies in his reply as amended.

"3. That there is no sufficient evidence of any such mistake of fact as would justify the Court in ignoring or permitting the jury to avoid the effect of Exhibit 1, both because the evidence shows no more than a mistake as to a future development and also because it fails to show that any mistake which could be relied on therein would be a mutual mistake or was known to or participated in by the defendant.

"4. Because it is not competent in a law action and in advance of an equitable decree cancelling or setting aside the covenant not to sue, to evade or ignore its effect upon the basis of any mistake of which there is any testimony whatsoever, and that the matter of avoiding Exhibit 1 for a mistake as distinguished from fraud, which isn't pleaded or proved, is one of equitable cognizance and which in no event could be submitted to a jury in a law action, and that the exhibit is binding and in full force in the absence of any decree for its cancellation.

"5. That if the jury should return a verdict for the plaintiff, it would be the duty of the Court and the Court would set it aside.

"6. Because there is no evidence of any mutual mistake of any present existing fact, and that the evidence at most shows that the plaintiff didn't realize the seriousness of his injury at the time that he made the settlement, that any such condition is not the fault and is not claimed to be the fault of the defendant, that there is no evidence that it was the fault of the defendant, participated in by the defendant, nor that the defendant is in any wise responsible therefor.

"7. Because in no event could Exhibit 1 be ignored or set aside without a tender of the amount received thereunder, and no such tender was made until yesterday, which was entirely too late, and that the plaintiff by retaining the money all during that time ratified the covenant, if it wouldn't otherwise be valid.

"8. For the reason that plaintiff having admitted the execution of Exhibit No. 1, and admitted the receipt of the consideration recited in Exhibit No. 1, said covenant not to sue evidenced by Exhibit No. 1 is binding upon the plaintiff, and the terms of the instrument are exclusive and exclude all other agreements and transactions had at the time of the execution of said instrument, and the plaintiff has failed to establish that such instrument was conditioned upon the diagnosis of Mr. Tillotson, has failed to establish that the instrument was signed under a mistake of a knowable existing fact, failed to establish that the execution of said instrument was obtained by any fraud on the part of Tillotson, and if the jury were to return a verdict in favor of the plaintiff and against the defendant, the verdict would be contrary to the evidence and contrary to the law applicable to the evidence, and it would be the duty of the Court to set the same aside.

"9. That the evidence discloses that Dr. Dorsey was plaintiff's own physician and in no way connected with the defendant or the Employers Mutual Casualty Company, and that the defendant and Employers Mutual Casualty Company would not be bound by any errors in judgment by Dr. Dorsey as to facts, the existence of which were not knowable to the Doctor, or as to mistakes in judgment of the doctors in regard to the future period of disability after the settlement was made, and therefore the plaintiff has failed to establish that the covenant not to sue evidenced by Exhibit 1 is not binding on the plaintiff and said covenant not to sue is a complete bar to plaintiff's cause of action."

The motion was denied and the cause was submitted to a jury which returned a verdict for plaintiff for $1,500. Appellant appealed from the judgment on the verdict, and from the order overruling its motion to direct, and from all other orders and rulings adverse to it.

The only error assigned or relied upon for reversal is the order of the court overruling the motion to direct a verdict. The fourth and seventh grounds of this motion have not been argued and will not be considered. This court, however, has held against both of these contentions. Reddington v. Blue & Raftery, 168 Iowa 34, 149 N. W. 933; Malloy v. Chicago G. W. R. Co., 185 Iowa 346, 170 N. W. 481.

The only contention of appellant on this appeal is that there is no evidence sufficient to overcome the covenant not to sue executed, and warranting the submission of the case to the jury on the question of mistake. Both parties concede this.

The covenant not to sue signed by plaintiff was as follows:

"Whereas on or about the 22d day of August, 1935, at 8 miles west of Ft. Dodge, Ia. in Webster County, Iowa, the undersigned sustained injuries and damages to person and property as the result of an accident with a car owned by Brady Transfer & Storage Co. and driven by J. A. Hayes:

"Whereas the undersigned has considered bringing suit against the said Brady Transfer & Storage Company and J. A. Hayes for all damages he has or may sustain as a result of said accident, but is now desirous of avoiding the expense of any litigation against the said Brady Transfer and Storage Co. and J. A. Hayes;

"Whereas the said Brady Transfer & Storage Co. and J. A. Hayes claims there is no legal liability upon their part arising out of said accident but is desirous of avoiding the expense of litigation;

"Now therefore it is agreed by the undersigned that in consideration of $530.80 this day paid to him by said Brady Transfer & Storage Company and J. A. Hayes, receipt of which is hereby acknowledged, the undersigned does hereby covenant and agree that he will not institute any civil proceedings of any kind against the said Brady Transfer and Storage Company and J. A. Hayes and particularly agrees that he will not institute any action at law or in Equity in any of the Federal or State Courts of Iowa or any other State, and specifically covenants and agrees not to sue the said Brady Transfer & Storage Co. and J. A. Hayes in this or any other State on account of any injuries or damages sustained by him or that may hereafter be sustained by him for or on account of said injuries and damages, past, present, or future, growing out of or which may hereafter grow out of said accident.

"It is further expressly understood and agreed that this instrument is, and is to be construed to be, only a covenant not to sue, and is in nowise, nor to be construed as, a release. I the undersigned hereby voluntarily sign this instrument with no promises or representations made to me other than the agreements and considerations herein expressed.

"READ OVER AND SIGNED BY ME THIS 20th day of September, 1935."

The court reports of every jurisdiction contain many cases involving the avoidance of instruments of this kind, or of a similar nature, because of fraud or mistake or overreaching of some kind in their procurement. In some jurisdictions chancery is the proper forum, but under the liberal procedure of this state the relief may be granted at law. But in either forum the relief when granted is based upon equitable principles. There is little disagreement in the controlling basic principles, but, as is often the case, the difficulty lies in their application.

■ This is the conclusion of the commentator whose brief appears in 48 A. L. R. 1462 et seq. He states: "Avoidance of release of claims for personal injuries on ground of mistake relative to the extent or nature of the injuries, is one upon which

there is much confusion and apparent difference of opinion. However, many of the cases which do ·not appear in harmony can be reconciled when the particular facts to which the statements of the court applied are taken into consideration. The subject is one in which general· rules are likely to be inaccurate and misleading, when separated from the facts of the particular cases in which they were laid down. * * *

"In considering the present subject, various factors should be taken into account. One of these is whether the parties were contracting merely with reference to certain injuries, or whether they were contracting also with reference to the question of the releasee's liability; in other words, whether the liability was assumed or admitted, and the parties, in executing the release, had in mind merely the question of injuries, or whether liability was denied and the settlement was intended as a compromise and release of all claims, the nature or extent of the injuries not being the principal matter upon which the parties were contracting. The nature of the injury and of the subsequent developments is also an important consideration, because it seems clear that the latter may be such that they clearly could not have been within the contemplation of the parties, * * *

"It has often been said that the law favors compromise. But * * * this rule has not been permitted to defeat substantial justice, where a release of a claim for personal injuries is executed under mutual mistake of fact, * * *

"But, however difficult it may be to draw the line between cases of the kind * * * in which the courts have refused to permit avoidance of the release on the ground of the releasor's mistake as to the extent of his injuries, and those cases in which relief has been granted, there is no doubt of the fact that in many instances the circumstances have been such that the parties should not be regarded as having contracted with reference to the subsequently developed injuries. * * *

"The rule is well settled, according to the great weight of authority, that a general release of a claim for personal injuries may, under proper circumstances, be avoided on the ground of mutual mistake as to the nature or seriousness of the injury."

The correctness of the foregoing conclusions is amply confirmed by the reported cases. For similar views and for a cor-

rect statement of the principles involved herein see the brief and comment in L. R.A. 1916B 776.

Since the ground for relief is mistake, let us see what the law regards as a mistake. This court, in National Loan & Investment Co. v. Bleasdale, 159· Iowa 529, 536, 141 N. W. 456, 458, defines it in the following language:

"Mistake, in a legal sense, is the doing of an act under an erroneous conviction, which act, but for such conviction, would not have been done. It is an erroneous mental condition, conception, or conviction induced by a misapprehension or misunderstanding of the truth, without which the act complained of would not have taken place."

In 40 Corpus Juris 1228 is the following definition:

"Mistake of fact is a term not easy of definition. It has been defined as a mistake which takes place when some fact which really exists is unknown, or some fact is supposed to exist which really does not exist."

In the Restatement of the Law of Contracts, section 500, the compilers, with their usual brevity and conciseness, state: "Mistake means a state of mind that is not in accord with the facts."

And in the Restatement of the Law of Restitution, section 6, c, they state:

"Mistake is always based upon ignorance which leads to a belief in the existence of non-existing things, or the non-existence of existing things. This is true even though there is no advertence to the particular facts which, if known, would prevent the mistake."

In Restatement of the Law of Restitution, section 7, it is stated:

"A mistake of fact means any mistake except a mistake of law. A mistake of law means a mistake as to the legal consequences of an assumed state of facts."

We have considered it important to set out clearly what a mistake of fact is, because of the strenuous insistence with which the appellant has argued that the mistake claimed by the appellee was not a mistake of fact, but only a mistake of belief. There is in fact no distinction between the two, for as stated in Re-

statement of the Law of Restitution, section 6, b: "A mistake is an erroneous belief."

■ Before setting out the pertinent facts in this case, it is well to have clearly in mind the legal principles involved. In order to warrant the setting aside of a contract of settlement, a release of liability, a written accord and satisfaction, or a covenant not to sue, because of mistake, it must be established that the mistake was a mistake of fact, and that it was the mutual mistake of both parties. It must have been a mistake as to a then present, existing fact, or a past fact. It must have been a basic, essential fact, that was a material consideration, or an inducing cause which constituted the motive for the execution of the instrument by the releasor.

As stated by the Pennsylvania court in Miles v. Stevens, 3 Pa. 21, 37, 45 Am. Dec. 621, it is not every mistake which will enable the party to avoid the contract, for to have this effect it must be of its essence, the sine qua non of the contract, or, as it is expressed, the efficient cause of its concoction.

· This is in accord with the elementary rule that no contract results where the parties mutually labored under such a mistake of fact that their minds never met.

Broadly stated, whenever an instrument of the kind in question has been executed by the parties upon the faith of a state of facts, in the absence of which, they clearly would not have so acted, the mistake may be corrected.

With these general principles in mind, let us go to the facts which have support in the record, and which, together with all legitimate inferences therefrom, we must consider in a light most favorable to the appellee.

■ When appellee was injured on August 22, 1935, he was about twenty-eight years old and was employed in the special-agent department of the Minneapolis & St. Louis Railroad. He was a high school graduate. In the collision his right humerus was broken in three parts, in such a way that there was a piece of bone, in the middle, detached from the two larger pieces at each end. He was taken to the hospital where his own physician, Dr. Dorsey, set the broken bone and put it in a splint or cast. He used a fluoroscope, an instrumentality by which he could see the parts of the bone when he was placing them in apposition. He received no other injuries. He was in good health. The normal period for the complete recovery from a fracture of

that kind in a person of his health and age where there is union of the bones, is approximately three months. An X-ray of the arm was taken that night, another on September 7th, and another on September 18th. These pictures showed the bones in good apposition and apparently united. The doctor saw him almost every day. He testified that from his examinations and from his experience as a surgeon he believed there was union of the bones; that they were in good position and union was progressing normally; that he told the appellee that his arm was progressing normally and that he should have a good arm; that at all times after he had reduced the fracture he thought there was union. He testified that union or repair of the fractured bone starts within two hours after placed in position and that from the very first there is a gradual solidifying, hardening process, and that in ten days there is a partial union at least; that after the bones have been in apposition and the gelatinous substance forms there is live union from the start, and that all it has to then do is to calcify and harden and turn into bone. He further testified that when he examined appellee's arm on September 18th from the appearance of his arm and everything that union was taking place at that time; that he believed there was union, since the X-ray showed the bones in good position, and in such case in a normal healthy person they practically always heal, and a union would have been well progressed at that time; that when he examined the X-ray on September 18th and 20th he thought there was some callous, but it was kind of questionable; that on that date he would expect the union to be so definitely formed that union would progress from there on. He testified that his statement that there would be complete union on December 1, 1935, was based on the fact that he had believed there was union of the fragments of the bone on September 18th; that the condition of the alignment led him to think that bony healing was going on. On October 7th Dr. Dorsey took an X-ray picture and it appeared quite certain to him that there was no union. He then put on a new splint with the hope that he might yet secure a union. Early in November he was convinced there was no union; that the arm was a "flail" arm and could be flipped around at the break. He then consulted Dr. Bowen and on November 13th they performed an open operation on the arm and discovered that there never had been any live union of the bones at any time since their frac-

ture, and that the small piece of detached bone was dead and had been since the fracture and it had prevented the other two parts of the bone from uniting. The piece of dead bone was removed, the ends of the other pieces were trimmed and by the use of a metal plate and screws a union was obtained, and in January 1937 the arm was reopened and the metal parts were removed. Both doctors testified that there was no union of the bones on September 20th, nor since the fracture and up to the second operation.

About two weeks after the collision an adjusting agent of the Employers Mutual Casualty Company of Des Moines who carried the liability insurance on the defendant's truck, called upon the appellee and told him he would see him later. On September 20, 1935, the agent again called on the appellee, and had his typewriter with him. He had been an adjuster of claims for about nine or ten years. He testified that he had investigated the case and went over to the appellee's home to settle his claim. He had settled with all of the people in the automobile in which the appellee had been injured. The appellee's wages had been $135 a month. The agent had with him a statement of Dr. Dorsey's bill for $75. The appellee had a statement of the hospital bill of $50.80. The agent told the appellee that he had seen Dr. Dorsey the night before and had obtained the following report (the report was on a printed form, and only the [Italic] portions were in writing):

"Name          *Don Jordan*
Nature and extent of injuries—describe fully   *Comminuted fracture of Humerus*
          full
Doing part work      *none*
Date able to resume work      *Dec. 1-1935*
Do you find any physical impairments NOT the result of these injuries?      *no*
Dated      *Sept. 20, 1935*      Signed      *T. J. Dorsey*  M. D.
City      *Ft. Dodge*      Address      *Ia.* "

The agent testified that he told appellee that he had talked with Dr. Dorsey, and that he gave him the doctor's report, and told him it was a statement from the doctor. When the agent was asked how he arrived at the sum of $530.80 and the item therein of $405, he replied:

"We, of course, had the doctor and hospital bills and the whole argument in the adjustment of the case was how much he was entitled to himself. Now here is the way we arrived at our arrangement. He had not been employed regularly. We conceded that he had employment for the next two months, and that for any contingency we would add another month."

That was three months at $135 a month. He then wrote and gave to appellee a draft for $530.80. It was payable to the appellee, the hospital and Dr. Dorsey.

The appellee testified as follows:

"When the adjusting agent came to him on September 20th he wrote down an account of the accident and he said: 'I want to pay for what time you lost in this accident and for expenses.' He wanted to know what my salary was and I told him $135. He said: 'I have a statement here from Dr. Dorsey that you will be off three months.' He figured it that it would be $405. He came to the house that morning around eleven o'clock, and then he left and went down and talked to Dr. Dorsey and came back with this paper signed by Dr. Dorsey. He said: 'Dr. Dorsey says you have union in the arm and I have here a signed statement by him that you can go back to work by December first.' I believed him when he told me the arm would be healed. Dr. Dorsey had told me that I had union in my arm and I believed him. Before I signed the paper, the agent told me about my arm, and said he had a lot of experience in settling these kind of cases and he took me to a mirror and by pressing on my arm said there was good circulation there. The arm was then in splints. He said if the arm didn't heal he would come back in a couple of months and see me. He said the paper was more or less to keep the record straight. I believed what the agent said when he told me he was paying for three months' time and the two bills. I believed at that time that the fragment of bone had united with the other two pieces. I did not know then that it was dead and there was no union. I would not have signed Exhibit 1 had I known these facts, or had I known Dr. Dorsey was mistaken about them. No other amounts except these items were discussed by me and the agent. I had made no claim on anybody when he came to see me. The instrument Exhibit 1 was signed at the conclusion of the talk."

The above statement fairly and fully sets out the evidentiary record of the facts pertinent to the issue in this case. It tends to support the pleaded allegations of the appellee. It tends to establish the following facts: (1) that the covenant not to sue was executed by the appellee under the mutual mistake of himself, the agent of the appellant, and of Dr. Dorsey, of present, existing facts, and of past facts, to wit, that the small detached piece of bone was alive, and that there was a living union of the three pieces of bone, and that the healing of the bone was progressing normally in the calcifying, solidifying, hardening process: (2) that the appellee, and the agent of the appellant, and Dr. Dorsey were in good faith; (3) that the appellee and the agent of the appellant each consulted with Dr. Dorsey and sought his advice in the matter and each relied upon him and upon his statements as to the condition of appellee's arm; (4) that the appellee was not negligent in not ascertaining the true condition of his arm; (5) that there was in fact no live union of the fractured parts of the humerus on September 20th, nor since the injury until after the second operation, and that there never had been any normal progress in the union of the parts; (6) that the death of the detached piece of bone prior to September 20th had prevented any union of the fractured parts; (7) that the fact that there was then a live union of the fractured parts on September 20th, and that it was then progressing normally toward a permanent union and recovery within approximately three months was a basic, essential, material ingredient, consideration and moving inducement in effecting the settlement, and in inducing the appellee to execute the covenant not to sue; (8) that appellee would not have accepted the settlement and executed the covenant not to sue had he known that there was then no live union and normal progress in the recovery of his arm, and that further operations would be necessary, further expense would be incurred, further time would be lost by him, and he would suffer further pain and endurance; (9) that the only damages settled were for loss of time, doctor and hospital expenses based upon a supposed condition which did not exist.

This is not a case where the parties treated on the basis of a fact being doubtful, and each one took the risk of the doubt and was willing to stand the hazard of the chances, nor was it a compromise founded on doubts. It was not a mutual recogni-

tion of the uncertainty of any fact, such as whether there was a union of the bone or not, on which each was willing and did gamble. It was not a mistake as to something which was to occur in the future. Nor were the statements of Dr. Dorsey to the appellee and to the agent of the appellant that there was a union of the bone and that this union was progressing normally, even though at times he may have stated it as a matter of belief, mere opinions, or mere prophecies as to what might happen in the future. Such statements by Dr. Dorsey were affirmations of fact, based not only on his experience as a surgeon, but his knowledge as attending physican, examination of the arm itself and X-rays thereof. They were made to both parties and with the knowledge that they were to be used and relied on in making the settlement.

The appellant has cited a number of the decisions of this court in support of the grounds of its motion to direct a verdict for it. We will not further extend this opinion by analyzing each of those decisions and distinguishing them from the case before us. We have considered all of them carefully. They announce correct principles of law fully in accord with the principlies herein stated, but the facts in those cases make the decisions therein wholly inapplicable as precedents in this case.

Our conclusions and the principles of law on which they are based find ample support in the decisions of this court as announced in Malloy v. Chicago Great Western R. Co., 185 Iowa 346, 170 N. W. 481; Reddington v. Blue & Raftery, 168 Iowa 34, 149 N. W. 933; Owens v. Norwood-White Coal Company, 188 Iowa 1092, 174 N. W. 851; Haigh v. White Way Laundry Co., 164 Iowa 143, 145 N. W. 473, 50 L. R. A. (N. S.) 1091.

In the Malloy case, 185 Iowa 346, 170 N. W. 481, supra, the plaintiff pleaded that the release in full for $450 signed by the plaintiff was procured by fraud, and by mistake, in separate counts. The defendant's superintendent and its doctor stated to the plaintiff: "You are all right to go to work now. You are all healed up and everything. You are as good as ever, Jimmie." The superintendent figured his loss of time and gave him a check, and received a receipt in full. The diagnosis was wrong. In holding that a cause of action was pleaded on either count, we said on pages 350, 351 and 353, 170 N. W. page 483:

"From this evidence, the jury might well have found that both plaintiff and the defendant, acting through its superintendent, based their settlement on the statement by Dr. Saunders, that plaintiff was all right 'to go to work, now,' and that he was 'all healed up,' and that he was 'just as good as ever.' Had this been merely an opinion or prophecy as to what might happen in the future, or as to the future results of an injury, and that foretold by way of opinion or prophecy did not happen or result, what was said could not be treated as in the nature of a mistake of fact. Seymour v. Chicago & N. W. R. Co., 181 Iowa 218, 164 N. W. 352. A mistake of fact, to constitute the basis of rescission, must relate to some present or past event, and the vital question to be determined is whether what Dr. Saunders said were statements of fact, or merely matters of opinion. If these were statements of fact, it is not very important through what process of reasoning or proof they were arrived at,—whether from observation or deductions based on expert or scientific knowledge. The doctor, basing his conclusion on the patient's apparent condition and the history of his ailment, pronounced him then in a condition to go to work, 'all healed up,' 'as good as ever.' These statements related to the present, and described his condition in apt language as it then was; and we entertain no doubt in saying that they were statements of facts, and so intended. * * *

"All that was said by the physician related to the present condition of plaintiff,—to him as he then was,—regardless of the future; and we are of opinion that his statements were of matter of fact, made as such by him, knowing that they would be considered as such in negotiating a settlement between the parties; and that, in making settlement, both parties relied thereon, as indicating permanent restoration to the condition of health previous to the injury."

In the Reddington case, 168 Iowa 34, 149 N. W. 933, supra, the plaintiff sought to avoid the release, given by him on receipt of $30, equaling two weeks pay, on the ground of mutual mistake as to the nature and extent of his injuries. Judgment for the plaintiff was affirmed. We approved the following instruction, appearing on pages 43 and 44, 149 N. W. page 936:

" 'To avoid the written release in question and warrant you in holding it for naught as a defense in this case, the bur-

den of proof is upon the plaintiff to show by the evidence the following matters: That, when the release in question was executed by the plaintiff and delivered to the defendant, that this plaintiff and the defendants entered into such compromise and settlement under a mutual mistake of fact; that both parties were wholly and unconsciously ignorant of the nature and character and extent of plaintiff's injury, and that it was not contemplated by the parties, or either of them, that the settlement and compromise compensated plaintiff or was in fact a settlement and compromise, for injuries sustained, other than the loss of time for a short period; that, at the time of the execution of said release, the plaintiff and the defendant did not know, contemplate, or consider the nature and extent of the injury, and that such settlement and compromise was made with total and unconscious ignorance that the nerves in plaintiff's wrist, which administers to the little, the ring, and partially to the second finger, was severed and destroyed, and that the tendons attached to and controlling the second, third, and little fingers of the left hand had become adhered and contracted; and that all that was contemplated, intended, and considered and agreed in such settlement and compromise, at the time such release was signed, by the plaintiff, was the payment for loss of time for a period of five weeks, * * *.' ''

In Owens v. Norwood-White Coal Co., 188 Iowa 1092, 174 N. W. 851, supra, in speaking of the opinion of a doctor, the court, through Justice Weaver, said, on page 1116, 174 N. W., on page 861:

''The physician who says that his patient is or is not afflicted with tuberculosis or with typhoid fever asserts a fact, and not a mere speculative opinion.''

In Haigh v. White Way Laundry Co., 164 Iowa 143, 146, 145 N. W. 473, 474, 50 L. R. A. (N. S.) 1091, supra, the defendant pleaded a settlement for $30 and a release in full of all damages, present and future. The plaintiff replied that the release was obtained through misrepresentations and mistake. We affirmed a ruling overruling a demurrer to the reply. We there said:

''This case presents but one question, whether or not the allegations of the reply are sufficient, in and of themselves, to

avoid the effect of the release executed by the plaintiff. There has been much discussion of this question in the books, and the line of demarcation is not clearly drawn, and it is sometimes difficult to distinguish the rule which affirms the settlement, and the rule that avoids the settlement, as the same has been applied to the facts in particular cases. * * *

"That the plaintiff's hand was injured, and that this was manifest and known to her, must be conceded. This independent fact was as well known to her as to the company. The length of time that would be required to heal was largely a matter of speculation, of opinion, based upon conditions then existing. An honest opinion given upon this matter could not constitute a fraud. The mere opinion, therefore, as to the time when she would recover from the injuries, standing alone, does not have the effect of avoiding the release relied upon. But in this case more than an opinion was given to induce settlement. Substantive facts were stated as a basis of the opinion, to wit, that the injuries were trifling; that the tendons of the hand were not injured. These are the assertions of distinct facts which had relation to, and direct bearing upon, the extent of the defendant's liability to the plaintiff; statements which, if true, tended to create in the mind of the plaintiff the impression 'that she would entirely recover therefrom and her hand would be as well as ever.' "

While the decision was bottomed on fraud, the quoted statement of law is just as applicable to a case where the ground of avoidance is mistake.

We have not referred to the statement of Dr. Dorsey that the appellee woud "be able to resume work Dec. 1, 1935" because this decision may be based solely on the mistake as to the union of the bone. Statements as to the period of disability, or the date of recovery, are uniformly classed as opinions, since their accuracy may depend upon unknowable or unpredictable future events. But where, as stated in the Haigh case, substantive facts are stated as a basis of the opinion, it becomes an assertion of a distinct fact, directly bearing upon the defendant's liability. And while it is a statement of fact as to a future result, where the date of recovery is based upon a mistake as to a present or past fact, it might very properly be considered on the issue of avoiding a release. Particularly, when,

as in this case, the inaccuracy of the prediction was caused solely by the mistaken belief that there was a union of the fracture when the statement was made, and the statement was made by the doctor and used by the defendant's agent in effecting the settlement. However, since such a holding is not necessary to this decision, we do not pass upon it.

A factor to be considered in cases of this kind is whether the question of liability was in dispute at the time of the settlement. The absence of such factor eliminates it from consideration. A fair inference from the record indicates that neither the appellant nor the insurance carrier thought there was any defense on that ground. After investigation the adjuster settled with all of the other occupants of the car. He had not settled for the car damage. But he came to the appellee with the statement that he was there to settle. There was no discussion as to the appellant's liability.

Appellant also urges that it could not be bound by any statements of Dr. Dorsey since he was appellee's physician and in no way connected with the defendant or its liability insurance carrier. If this were a case of fraud there would be more merit to this contention, since a fraudulent representation must come from the party charged or one representing it. But this rule of law has no application where avoidance of the instrument of settlement or release is based upon mistake. What was the source of the mistake or who was its author is of no consequence if the parties in good faith relied upon it, or were misled by it, and the releasor was thereby induced to make a settlement, or to release a liability, which he would not otherwise have done. Whether the doctor making the mistaken diagnosis was the doctor of the plaintiff, or the doctor of the defendant, is immaterial, if it was a good faith diagnosis, and was in good faith relied upon.

Furthermore, it is a fair inference from this record that while Dorsey was appellee's doctor, the appellant was consulting with him and getting information from him and using it to bring about a settlement. He was getting information from him so that he might render better service to his employer and to the appellant. And after using that service and benefiting by it, they cannot escape their just liability by saying that the doctor was not their man. The adjuster believed and relied upon the doctor's diagnosis. He told the appellee he was there to settle

the doctor and hospital bills. He thought there would be no more such expense and he paid off the doctor and the hospital. If he thought there would be more of such expense, then he was not acting in good faith in using the doctor's statements to effect a settlement.

We think the appellee, the doctor and the agent were all acting in good faith. They were just honestly mistaken. No one can believe that the appellee would have accepted $125.80 in payment of his doctor and hospital bill, had he known that he was going to be required to pay $339.45 for additional service of that kind. Or that he would have accepted pay for three months loss of time, had he known that his disability was to extend for many months more. Would any reasonable person say that on September 20th the appellee would have made the settlement he did make, had he known he was going to have a "flail" arm, instead of a good one?

Appellant has insisted that an affirmance will be a reversal of our previous holdings in matters of this kind, and that it will be a departure from the policy of this court in looking with favor upon compromises, and of interfering with reluctance with private settlements. It is in error in this. The attitude of the court is not changed in that respect. There is nothing in the nature of a compromise contract, a release of liability, or a covenant not to sue, that calls for any different construction or treatment at the hands of a court, than that accorded to other contracts. There is nothing so sacrosanct about them that courts should disregard the intentions of the parties to them. The courts in administering equitable relief are not bound by mere terminology, and make no distinction between an unjust compromise and any other unjust contract.

This thought is expressed in section 11, c, of Restatement of the Law of Restitution, as follows:

"Compromises, like other agreements, are ordinarily based upon the assumption by both parties that certain facts, although not all the facts as claimed by one side, exist; and where this is so the transaction can be set aside and restitution granted if the basic assumptions are not true."

The record clearly shows that the able trial court was right in submitting the issue of mistake to the jury, and the judgment of the court is affirmed.—Affirmed.

MITCHELL, C. J., and RICHARDS, HAMILTON, STIGER, SAGER, HALE, and OLIVER, JJ., concur.

MILLER, J., being of counsel for the defendant in the trial below, took no part.