Marian Wieland, appellee, v. Cedar Rapids and Iowa City Railway Company, appellant.

No. 47815.

(Reported in 46 N.W.2d 916)

April 4, 1951.

Frank C. Byers, of Cedar Rapids, and Messer, Hamilton, Cahill & Bartley, of Iowa City, for appellant.

D. C. Nolan, of Iowa City, for appellee.

Smith, J.—The only issue involved here is alleged mutual mistake of fact in the making of a settlement about two months

after the personal injury occurred. The good faith of the settlement is not assailed in pleading, proof or argument. Defendant pleaded it and by appropriate pleading and motions questioned the sufficiency of the evidence of mutual mistake to justify submission of that issue to the jury. There was a verdict for $648 upon which judgment was entered with permission to defendant to have the amount paid in settlement applied in partial payment. Defendant appeals.

The injury occurred January 17, 1947, while plaintiff was a passenger on one of two interurban cars of defendant which collided. The written settlement agreement was made March 13, 1947, and so far as material here provided: "I do hereby release and forever discharge [defendant] of and from all debts, claims, demands, actions and causes of action whatsoever which I now have or which I may have or claim to have in the future and which have arisen or may arise by reason of or in any manner have grown out of or may in the future grow out of said accident." The agreed amount, $200, was paid at the same time.

Plaintiff was examined by Cedar Rapids doctors on two occasions before the settlement was consummated, both by arrangement of defendant's attorney. Plaintiff testified Dr. Lehr told her she was suffering only from sore muscles and was not injured except from the shaking up. The doctor testified her visit was January 28, 1947: "Her complaint was pain in her neck muscles and right posterior region of the neck and the right shoulder. * * * I found no clinical evidence of any bony injury. It was my impression * * * that it was a muscle spasm, a muscle sprain, and told her so. * * * there was no indication in my opinion for X-rays. An incidental complaint was irregular vaginal bleeding since the accident * * *. I * * * told her if there was no clinical improvement in her symptoms to return in five to seven days and in the interim suggested that she should apply heat to the affected areas of soreness, namely, the neck and shoulders."

On February 26, 1947, plaintiff went to Dr. Keech. All she said of this visit (on direct examination) was that he told her she was in "perfect condition." On cross-examination she testified she had stopped menstruating; but a few questions later she said she went to him because she had been menstruating so long —"my neck had quit hurting at that time. Q. And you didn't

have any pain in your back either, did you? A. If I did it wasn't enough to bother; I don't remember."

This was still two weeks prior to the settlement. Dr. Keech's testimony was naturally more detailed but not materially different. He said she told him her injuries consisted of contusions of both knees, pain in back, "occipital region", and both shoulders; also that she had been very nervous since the accident and her menstrual period prolonged and had run into her next regular period. He said she told him she had a hip dislocation three and one-half years before, "She did not tell me that following the accident the same day she had pain in her lower back and in her legs. * * * My records show she had a slightly enlarged uterus and cervix which I did not connect up in any manner, shape or form with this accident. I expressed no opinion to her as to her physical condition, or as to how long she might be affected by being in this accident."

Just preceding this second examination plaintiff and her husband had voluntarily come to defendant's attorney and advised him she would settle for $200. The attorney disclaimed authority to make the settlement: "I told Mrs. Wieland that I didn't think that she had suffered any injury of that proportion and I questioned the extent of her injuries * * *. I told Mrs. Wieland that I'd like to have some additional proof as to her physical condition and I asked her if she wouldn't submit to another examination." This was the occasion for sending her to Dr. Keech after an unsuccessful attempt to contact Dr. Lehr. Some two weeks after Dr. Keech's examination plaintiff and her husband again voluntarily came to defendant's attorney and completed the settlement on the basis proposed by her.

There is testimony of a subsequent visit to Dr. Keech. Plaintiff thinks it was after they had moved about the middle of May 1947: "I lifted wash water and then had to go to the doctor. * * * I was trying to take cistern water from outside to the washhouse." She says at that time she had pain "down low in the lower back. I went to Dr. Keech and he examined me and taped me. Following that I just couldn't lift and was in bed for about a week." Dr. Keech does not deny this second visit, though he seemed to have no office record of it.

Plaintiff testifies she went to her regular doctor at North

English the latter part of 1948 or the fore part of 1949 and he recommended that she go to Dr. Wray of Cedar Rapids. She had in the meantime gone to chiropractors in Marion for three months in the summer of 1947; and had made one visit to Dr. Scanlon in Iowa City who prescribed a course of treatment which she says she followed. None of these men testify.

Dr. Wray testifies he first saw plaintiff on May 13, 1949. That was twenty-six months after the settlement and nearly twenty-eight months after the injury. The pertinent part of Dr. Wray's testimony is that the X-ray revealed a "congenital deformity present in the fifth lumbar vertebra. * * * Otherwise the X-rays were essentially negative for bone or joint disease." He says: "My diagnoses in her case were: Deformity, fifth lumbar vertebra, congenital in origin; No. 2, strain chronic, moderately severe, involving the lumbosacral joint, secondary to No. 1, and aggravated by injury; No. 3, myositis, chronic, low-grade, involving the left trapezius muscle, cause undetermined. Myositis means low-grade muscular involvement due to either scarring or low-grade infection." He later says: "A myositis condition can come from infections, such as sinus, throat, infected teeth and so on. Can be due to trauma—injury."

He says "the lumbosacral joint can be made more susceptible to ordinary injuries by deformities of the fifth lumbar vertebra; that ordinary traumas of everyday life can light up some deformed vertebra and cause pain."

He was interrogated at some length as to the myositis condition in this case being caused by the injury on defendant's car, but he went no further than to express the opinion that "It is possible. It could be caused by the accident." At no time does the doctor express an opinion that the myositis condition *was* so caused.

The present action was commenced August 19, 1948, approximately nine months before plaintiff consulted Dr. Wray. We have to determine whether there is here evidence of mutual mistake sufficient to support a verdict setting aside the settlement of March 13, 1947. We find no such evidence in the record.

I. In Pahl v. Tri-City Ry. Co., 190 Iowa 1364, 1367, 1368, 181 N.W. 670, 671, a case quite analogous to this, we said:

"It is well-settled that compromises and settlements will

not be disturbed for any ordinary mistake, either of law or of fact, since their very object is to settle disputes without judicial controversy. In the absence of fraud, misrepresentations, concealment, or other misleading incidents, a compromise into which parties voluntarily enter must stand and be enforced, although the final issue may be different from that which was anticipated.

'In such classes of agreements and transactions, the parties are supposed to calculate the chances, and they certainly assume the risks, where there is no element of bad faith, breach of confidence, misrepresentation, culpable concealment, or other like conduct amounting to actual or constructive fraud.' 2 Pomeroy on Equity Jurisprudence (4th Ed.), Section 855.

"Plaintiff herein signed the release with full knowledge of what it contained, and no claim is made that he did not understand its terms and provisions. It cannot be said that there was any mistake inducing the compromise. Both parties were innocent, and acted in good faith. Neither can it be argued that the payment was made and the release signed for a certain known injury. It was a settlement made to avoid litigation, and subsequently plaintiff discovered that his own doctor was mistaken as to the character of the injury which plaintiff received.

"Where parties knowingly and purposely make an agreement to compromise and settle a doubtful claim whose character and extent are conditioned upon future contingencies, such settlement may not be avoided simply because the event happened quite differently from the expectation, opinion, or belief of one or both of the parties. Seymour v. Chicago & N. W. R. Co., 181 Iowa 218. In the opinion in the Seymour case, this language is approved:

'The subsequent discovery by one giving such a release that he was worse hurt than he had supposed, would not, in and of itself, be ground for setting aside the settlement or limiting the release.' "

The opinion distinguishes earlier cases including Reddington v. Blue & Raftery, 168 Iowa 34, 149 N.W. 933 (cited by plaintiff here) as involving matter written into the release "which was not intended nor, in fact, made by the parties thereto." There is no subsequent decision in which we have modified or repudiated the language above-quoted from the Pahl case.

Plaintiff's principal reliance here is on our later decision in Jordan v. Brady Transfer & Storage Co., 226 Iowa 137, 284 N.W. 73. The distinction between that and the instant case is obvious. In the Jordan case plaintiff's doctor, after setting the fractured arm (fractured in two places), mistakenly told him on September 18 the bones were uniting and that there would be complete union by December 1. On the strength of this assumed situation an agreement not to sue was made for *an amount sufficient to cover loss of wages and expense on that basis.* It later became clear there never had been or could be any union because the section of bone between the two fractures was dead and had to be removed so the live parts could be brought together to attain final union.

In that case there was no doubt the doctor's mistake induced the settlement which was for an amount expressly computed to cover plaintiff's loss as it would have been had the doctor not been mistaken. Here there was a settlement for a lump sum having no relation to any computation based on estimated loss of time and expense. The parties clearly intended to cover future developments whatever they might be.

There is nothing to be gained by discussion of other cases in which the facts are not comparable to those here. In fact plaintiff discusses and seems to rely only on the Jordan case which, as we have pointed out, is clearly distinguishable.

II. Plaintiff testifies that if she had known she would "experience and suffer the conditions" that have since arisen she would not have made the settlement. But that does not help her case. Practically every settlement for personal injury involves the element of chance as to future consequences and developments. There are usually unknown and unknowable conditions (congenital or otherwise) that may affect the ultimate recovery or failure of recovery. Mutual ignorance of their existence cannot constitute "mutual mistake." No two persons have the same power of recuperation, and the settlement is an agreement by which both take the chance that the amount paid may eventually prove to have been too great or too small.

Where, as here, there is no serious dispute as to defendant's liability, the only unknown element is the one that concerns what may eventually be the consequences of the injury. If that could

be known the transaction would be, not compromise, but payment.

The fact, if it be a fact, that plaintiff's unknown congenital spinal deformity delayed her recovery and aggravated her suffering does not constitute ignorance of its existence a mistake of fact.

III. It is unnecessary to pass on the contention of defendant that plaintiff's tender back of the amount received in settlement was neither sufficient nor timely, since we hold there was no evidence of mutual mistake justifying submission of that issue to the jury.

The case will be reversed and remanded and the trial court instructed to enter judgment for defendant in accordance with rule 349, Iowa R.C.P.—Reversed and remanded.

All JUSTICES concur except MANTZ, J., not sitting.