Maxine **STETZEL**, Appellee,

v.

James C. **DICKENSON**, Appellant.

No. 53750.

Supreme Court of Iowa.

Feb. 10, 1970.
Rehearing Denied April 6, 1970.

Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellant.

Nolan, Lucas & Nolan, Iowa City, for appellee.

LeGRAND, Justice.

This case arises out of an intersection accident which occurred in Iowa City on September 27, 1965, as a result of which plaintiff sustained certain personal injuries. On December 2, 1965, she executed a release and was paid $400.00 by defendant's insurance carrier.

Being dissatisfied with her settlement, plaintiff subsequently brought this action against defendant, seeking damages for her injuries. Defendant relied on the release as a complete defense. Plaintiff then alleged the settlement was the result of mutual mistake and was not voluntarily entered into because of the "extreme mental pressure" exerted upon her and the "high pressure tactics" practiced by the insurance carrier. These issues were submitted to the jury over defendant's timely motion for directed verdict. The jury found for plaintiff in the amount of $3000.00. Defendant filed a motion for judgment notwithstanding the verdict under rule 243, Rules of Civil Procedure, which was also overruled.

He appeals from these rulings and raises here the sole issue that "there was no competent, credible evidence in the record by which a jury could find that the release admittedly given by plaintiff was unenforceable." We hold defendant was entitled to a directed verdict under the record before us.

The answer to this problem is found in a series of our own decisions, beginning with Jordan v. Brady Transfer and Storage Company, 226 Iowa 137, 284 N.W. 73, and continuing through Wieland v. Cedar Rapids and Iowa City Railway Company, 242 Iowa 583, 46 N.W.2d 916; Reed v. Harvey, 253 Iowa 10, 110 N.W.2d 442; Barnard v. Cedar Rapids City Cab Company, 257 Iowa 734, 133 N.W.2d 884; and Thomas v. Sheehan, 260 Iowa 618, 149 N.W.2d 842. On this subject generally see Annotation at 71 A.L.R.2d 83.

From these cases certain rules have evolved which are determinative of this appeal:

(1) A release is a contract, and its validity is governed by the usual rules relating to contract;

(2) A release may be set aside for mutual mistake of a material past or present fact, and the one who seeks that relief has the burden of proof;

(3) There is a definite trend toward granting relief liberally where the injured party has released a claim under the false impression he was fully informed as to the nature and extent of his injuries;

(4) In determining if there was mutual mistake we consider whether the settlement amount was based on an item-by-item computation or was a lump sum payment for the damages sustained; whether the question of liability was compromised as part of the settlement; and whether the amount paid was so inadequate as to indicate the matter of settling future or unknown damages was not within the contemplation of the parties;

(5) It is the manifest intent of the parties, not the particular language used, which controls; and

(6) An agreement to compromise unknown injuries and future damages is valid and enforceable if the parties intended that result at the time the settlement agreement was made.

We might add that each case depends on its own peculiar facts and circumstances and, to repeat once more a familiar cliché, that the rules above set out are easy to state but difficult to apply.

Plaintiff relies exclusively on the case of Thomas v. Sheehan, supra, for urging us to affirm this judgment. She argues the present case falls squarely within the doctrine of the Sheehan case. Defendant, on the other hand, while not as willing as plaintiff to gamble success on a single citation, apparently believes his principal support comes from Wieland v. Cedar Rapids and Iowa City Railway Co., supra.

Our task is to test the facts here against the rationale of those cases and the others we have referred to. As pointed out in several of them, there is no real conflict. The same principles have been steadfastly adhered to in all; the differences in result are explained by the varying factual situations.

We recognized this recently when we said in Thomas v. Sheehan, supra, 260 Iowa at page 624, 149 N.W.2d at page 845:

"We are not unaware of the dilemma in which claims adjusters find themselves in trying to settle as against unknown injuries and future developments. * * * But we are not convinced that the alleviation of a harsh rule [which would hold releases to be final regardless of mistake] is necessarily bad. The development of the law permitting correction of mistakes has been in the interest of justice. The doctrine that courts favor compromises still has meaning but when it appears that a mistake has been made it is proper to take a look at the factual situation as it existed when the words were written."

It seems unnecessary to point out that not every mistake will vitiate a settlement. It must be mutual, and it must be material; and it must be concerned with a present or past fact.

In our consideration of this matter, we view the evidence in its light most favorable to plaintiff under rule 344(f), (2), Rules of Civil Procedure. Even so, however, we are unable to agree that a jury question was presented.

We recite the important evidence upon which plaintiff relies.

Plaintiff's injury occurred when the accident impact threw her sideways, causing her head to strike the window. Almost immediately she experienced a headache. She went to the Student Health Center—she was then a student at the University of Iowa—where she was kept overnight. She was attended by a Dr. Dewey, who released her to return home the following day. Her headaches continued. She stated it was "a headache like you would expect to have if you got hit on the head." For some weeks she "didn't feel good," by which she said she meant she had headaches. The doctor gave her "pain pills" and when necessary she would take a pill and

lie down. She said as long as she was "lying down it was sort of gone." She testified that the headaches interfered with her ability to study, that her concentration was affected, and that her classes suffered.

During this time she asserts she was being importuned by the insurance company adjuster to sign a release and settle her claim. She declares she was reluctant to talk to him, but he was so persistent she was unable to avoid him. Finally on December 2, 1965, she signed a release for $400.00. As far as the evidence shows, she then had incurred no medical or other expense of any kind. She was not employed and had no loss of income, although there is some suggestion she would have sought employment except for the accident.

Shortly, if not immediately, after the settlement her symptoms began to change. The type of pain was different although it was still confined to headaches. They merely became more severe. At the end of December, or the first of January, she noticed something different with reference to the use of her hands. She seemed to have difficulty picking things up at times. This was not present before she signed the release. She also noticed that after the accident her eyes would tire more easily, particularly her right one. Sometimes, too, she seemed to be forgetful, a condition which did not exist prior to the accident. She testified she was still having headaches at the time of trial, although they had become infrequent.

Sometime in March of 1966, three months after the settlement, plaintiff went to another doctor. At that time she was given an electroencephalogram, referred to by the witnesses as an EEG. In all several EEG's were given. Apparently no treatment was indicated nor was any medication, except perhaps pain pills, prescribed.

On cross-examination plaintiff testified her headaches began immediately after the accident and continued up until June or July of 1966. During that time she returned to the student health center a number of times because Dr. Dewey wanted to check her.

Dr. Dewey did not testify. Plaintiff's only medical testimony came from Dr. Francis J. Whalen, a resident in Psychiatry at the University Hospitals. He stated he made two diagnoses: one, that plaintiff is a passive, dependent personality which means she is "a sort of timid person"; the other found that she suffered from post-traumatic headache syndrome.

Dr. Whalen first saw plaintiff on September 13, 1968, almost three years after this accident and just two months before trial. He rendered no treatment; his services consisted only of examination, diagnosis and testimony.

In the fall of 1967, approximately two years after the accident involved in this appeal, plaintiff was in another automobile accident in California. At that time she was in a car which was struck from the rear and suffered what she describes as a whiplash injury.

Dr. Whalen's examination was made and his conclusions reached without disclosure of the second accident. He admitted such knowledge would have had some effect on the opinion he ultimately reached. He testified a whiplash injury sometimes produces the same headache syndrome as that caused by a direct blow to the head.

I. We are unable to liken this case to Thomas v. Sheehan, supra, upon which plaintiff places exclusive reliance. Neither does plaintiff benefit from our pronouncements in Reed v. Harvey and Barnard v. Cedar Rapids City Cab Co., both supra, quoted approvingly in the Sheehan opinion. We do not retreat from anything said in these cases; we only say it is not here applicable.

In Sheehan, Reed and Barnard settlement was based on specific item-by-item calculations plus "nominal" or "trifling" amounts for "trouble" or "suffering." We held we were able to ascertain the precise elements upon which the settlement was

made and concluded the parties could not have contemplated any compromise of unknown damages or injuries.

In each of those cases, too, there was a later injury disclosed which was quite different from the one known at the time of settlement. Each also involved substantial medical, hospital, surgical, and other expense besides some period of disability.

██ None of those circumstances is present here. Plaintiff was paid $400.00 for her injuries without any showing of special damages. In fact at the time of settlement plaintiff has incurred no medical, hospital, or drug expense. She had no loss of income. This must be held to have been a lump-sum settlement to compromise plaintiff's claim for damages, whatever they might be. Nor can we say $400.00, while it may not be a grand amount, is either "trifling" or "nominal," even by today's standards.

Furthermore while Sheehan, Reed, and Harvey involved a later discovery of entirely different injuries shown to have been caused by the accident, plaintiff here has proven only that her headaches persisted longer than anticipated and were more severe. At no time has she claimed or proven anything more than post-traumatic headache syndrome. But these same complaints in lesser form were present at the time of the settlement.

We are convinced plaintiff's case fits the pattern of Wieland v. Cedar Rapids & Iowa City Railway Co., supra, 242 Iowa, 583, 588, 46 N.W.2d 916, 918, where we said:

"Here there was a settlement for a lump sum having no relation to any computation based on estimated loss of time and expense. The parties clearly intended to cover future developments whatever they might be. * * *

"Plaintiff testifies that if she had known she would 'experience and suffer the conditions' that have since arisen she would not have made the settlement. But that does not help her case. Practically every settlement for personal injury involves the element of chance as to future consequences and developments. There are usually unknown and unknowable conditions (congenital or otherwise) that may affect the ultimate recovery or failure of recovery. Mutual ignorance of their existence cannot constitute 'mutual mistake.' No two persons have the same power of recuperation, and the settlement is an agreement by which both take the chance that the amount paid may eventually prove to have been too great or too small."

This must, of course be read in the context of that case, and we emphasize it applies only to those situations in which the parties intended to enter into a settlement covering future as well as existing damages. It does not conflict with Sheehan and similar cases. They simply cover different factual situations.

██ Perhaps we have spent too much time on this matter since we find there is another, and greater obstacle, to plaintiff's cause. We have already mentioned a claimant may foreclose future damages, even those arising from injuries then unknown, if that is the intention at the time the settlement is made. Here we cannot escape the conclusion that the parties did intend that result. On cross-examination plaintiff testified as follows:

"As far as I know I told the representative of the insurance company about the difficulties I was having when I visited with him. The accident happened in September and it was in December that I signed a release and accepted a draft for $400.00. *I understood what the paper was and that they were paying me for damages as a result of the accident. I understood the paper that I signed, but I didn't want to sign it. It was my understanding that I was releasing them from all further claims when I signed the release. It was explained to me that this would be a conclusion and settlement and end to it. I knew what the agreement was that I was*

*signing and I read and understood it. * * "* (Emphasis supplied.)

Under the principles we have previously referred to, we find this was meant by the parties to be a final and complete settlement of plaintiff's claim, that it was so understood by plaintiff, and that no evidence upon which it could be set aside was produced by her.

II. We must also consider plaintiff's allegations that the release was obtained by "extreme mental pressure" and "high-pressure" tactics of the insurance adjuster. The parties considered this as a pleading that the release was the result of undue influence. The case was tried and submitted on that theory. We so consider it here.

█ Undue influence is defined as any "improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely." Black's Law Dictionary, Rev. Fourth Ed.

In 17 Am.Jur.2d, Contracts, section 154, page 505, we find this, "Generally, in order to invalidate a contract, undue influence must operate to deprive a party of his free agency or will." A similar statement is found in 13 Am.Jur.2d, Cancellation of Instruments, section 29, page 522.

█ In Menary v. Whitney, 244 Iowa 759, 772, 56 N.W.2d 70, 77, we discuss the elements of undue influence. We there hold that influence to be "undue" must be such as to deprive one person of his freedom of choice and to substitute the will of another in its place. See also Leonard v. Leonard, 234 Iowa 421, 429, 12 N.W.2d 899, 902; Stephenson v. Stephenson, 247 Iowa 785, 797, 74 N.W.2d 679, 686, and Harrison v. City National Bank of Clinton, U.S.D.C., Southern District of Iowa, 210 F.Supp. 362, 373.

█ We find no evidence here to support a finding that plaintiff executed the release as the result of undue influence. The fact that the adjuster was boorish and intruded upon plaintiff's privacy is not significant unless it resulted in depriving her of her independence of action and substituted his will for hers at the time the release was signed. There is a total absence of evidence that it did. In fact the record proves conclusively to the contrary.

█ Plaintiff places great importance on her testimony that she did not want to sign. This is by no means the same as saying undue influence was exercised upon her. Plaintiff was a well educated, highly intelligent young lady. Her scholastic record was outstanding. Before signing the release she sought independent advice from her landlady, in whom she apparently had considerable confidence, and from an Iowa City lawyer—not counsel now representing her—whose help she now denounces. Whether his advice was good or bad is not the question we here consider. The fact that she sought and received independent advice is a proper matter to consider on the question of undue influence. Menary v. Whitney, supra, 244 Iowa at page 772, 56 N.W.2d 70, 77.

█ In addition to all this is the testimony heretofore set out in which plaintiff concedes she knew the purpose of the instrument, read it, understood it, and realized its consequences before signing. We hold all these circumstances refute undue influence as a matter of law.

We conclude defendant was entitled to a directed verdict and the judgment for plaintiff is therefore reversed. We enter judgment for defendant as permitted under rule 349, Rules of Civil Procedure.

Reversed.

MOORE, C. J., and SNELL, STUART and MASON, JJ., concur.

BECKER, J., concurs in the result.

LARSON and RAWLINGS, JJ., dissent.