PATHOLOGY CONSULTANTS and Black Hawk Medical Laboratories, P.C., Appellants,

v.

Christopher A. GRATTON; Christopher A. Gratton, M.D., P.C.; James D. Collins, Jr.; and James D. Collins, Jr., M.D., P.C., Appellees.

No. 69146.

Supreme Court of Iowa.

Jan. 18, 1984.

Rehearing Denied Feb. 10, 1984.

H. Daniel Holm, Jr., of Ball, Kirk & Holm, P.C., Waterloo, for appellants.

Patrick M. Roby and Mark L. Zaiger of Shuttleworth & Ingersoll, Cedar Rapids, for appellees.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McCORMICK, SCHULTZ and WOLLE, JJ.

SCHULTZ, Justice.

This appeal involves several contractual disputes arising out of a covenant not to interfere with contractual arrangements and two different covenants not to compete. The district court denied the plaintiffs relief on their multi-count petition that sought to enforce these covenants. We affirm.

The present controversy was precipitated by the break up of a Waterloo partnership of pathologists, Pathology Consultants (PathCon), and the stockholders of a corporation, Black Hawk Medical Laboratories, P.C., (BHML). At the time of the split, the

partners of PathCon, Dr. Gilbert R. Clark, Dr. James D. Collins, Jr., and Dr. Henry B. Lowsma, were also the sole stockholders of BHML. Dr. Christopher Gratton was then an employee of both the partnership and the corporation. Prior to the breakup, the partners of PathCon and its four employees were the only practicing pathologists in the Waterloo area and exclusively serviced all of the metropolitan area hospitals—Allen Memorial Hospital (Allen), Saint Francis Hospital and Schoitz Memorial Hospital in Waterloo and Sartori Memorial Hospital (Sartori) in Cedar Falls. They also served numerous hospitals in nearby communities including Virginia Gay Hospital (Virginia Gay) at Vinton.

PathCon earned its revenues by providing pathological services to the hospitals' laboratories. In return for these services, the hospitals paid PathCon a percentage of their gross laboratory receipts. Although Drs. Clark and Collins had individual contracts with two hospitals, Allen and St. Francis, the revenue from each contract was funneled directly into the partnership. Under these two contracts, the partner independently negotiated the percentage that would be paid by the particular hospital he served. Any disparity in revenues from these hospitals did not create an unevenness in the income of the partners since the partnership's net income was divided equally without regard to source.

Dr. Collins had an individual contract with Allen and also worked part-time at Virginia Gay. Dr. Gratton, as an employee of PathCon, worked at Allen with Collins.

BHML was formed in 1966 by the then PathCon partners. Since its inception, BHML operated as an independent laboratory in competition with the various hospital laboratories. BHML's income was derived from laboratory work referred from the hospitals served by PathCon and from referrals by individual physicians. Although the four metro hospitals have their own laboratories, much of each hospital's laboratory work was diverted to. BHML.

In 1980 friction developed between Dr. Collins and the other two members of the partnership. In particular, the other two partners believed that Allen Hospital (contracted and serviced by Collins) was not generating sufficient income and that too few laboratory tests were being referred from Allen to BHML. Because Collins did not share this view, he withdrew from the partnership and the ownership of BHML on February 9, 1980. Under the partnership agreement, Collins had the right to continue his relationship with Allen in an individual capacity. Additionally, the partners informally agreed that he could continue serving Virginia Gay.

The parties decided that Collins' termination should be effective at the end of February. At the instigation of Collins, Dr. Gratton resigned from his employment on February 12. Because Gratton worked full time at Allen, PathCon and BHML had little need for his services. Accordingly, they agreed to his termination and had their attorneys draw up a written waiver. This waiver was subsequently executed by PathCon and BHML and released Gratton from the covenant not to compete in each employment contract.

The first controversy arose when Sartori Hospital, after an unsuccessful attempt to renegotiate its contract with Dr. Clark, terminated its relationship with PathCon on June 16, 1980. After an interim arrangement with Allen Hospital, Sartori and Collins, P.C., entered into a pathology contract on July 1, 1980. Shortly thereafter, laboratory referrals to BHML from Allen, Sartori, and Virginia Gay declined. At about the same time, Collins began doing laboratory work for individual physicians at Allen Hospital.

PathCon and BHML filed a multi-count action against Collins, Gratton and their professional corporation. Their claims against Collins were based on alleged breaches of his contracts with PathCon and BHML, respectively. The claims against Gratton were centered on the validity of the waiver releasing Gratton from his covenant not to compete. As noted earlier, the district court denied all of plaintiffs' various claims for relief.

On appeal, the issues have been narrowed. In particular, we must decide whether (1) Collins breached his partnership agreement either by interfering with PathCon's contractual relationship with Sartori Hospital or by subsequently entering into a contractual relationship with Sartori; (2) Collins breached his employment contract with BHML by competing with the corporation after his withdrawal from ownership; (3) plaintiffs' waiver of Gratton's covenant not to compete was the result of a mutual mistake by the parties or plaintiffs' unilateral mistake coupled with fraud or inequitable conduct on the part of the defendants; and (4) the trial court erred in evidentiary rulings during discovery proceedings concerning certain material in the possession of the Collins' attorney.

*I. Breach of partnership agreement either by interference with or assumption of the Sartori contract.* The alleged breach of the partnership agreement arose from the termination of the PathCon-Sartori contract. This written contract for pathology services was unlike the St. Francis contract with Dr. Clark and the Allen contract with Dr. Collins for similar services since PathCon was a party to contract rather than an individual partner. The term of the contract was year to year; however, either party had the express right to terminate it upon giving ninety days' notice. Sartori exercised this option and terminated its relationship with PathCon on June 16, 1980. It entered into a pathology contract with Dr. Collins on July 1, 1980. PathCon contends that Collins breached the partnership agreement in two ways: first by interfering with its contractual relationship with Sartori Hospital and second, by entering into a contractual relationship with Sartori. These claims were based on paragraph 15 of the 1979 amendments to the partnership agreement.

The precipitating reason for the amendment was the retirement of a senior partner and the desire of Drs. Clark and Collins to have an employee, Dr. Lowsma, join them in the existing partnership. Since the partnership wanted to protect its existing contracts with hospitals from any

further activity of an expelled or withdrawing partner, paragraph 15 was inserted. This paragraph provides in pertinent part:

Dr. Gilbert R. Clark has a contractual arrangement with St. Francis Hospital in Waterloo, Iowa, to operate the Pathology Department therein and Dr. James D. Collins, Jr., has a contractual arrangement to operate the Pathology Department in Allen Memorial Hospital in Waterloo, Iowa. The partnership has different contractual arrangements with the remaining hospitals mentioned previously for the overseeing or supervision or operation of the Pathology Departments within the various hospitals. In the event that either Dr. Gilbert R. Clark or Dr. James D. Collins, Jr., withdraws or is expelled from the partnership, neither the partnership nor the remaining members in the partnership shall attempt to interfere with the contractual relationship between either of these physicians and the hospital with which he has a contractual arrangement nor obtain a contractual arrangement with either of said hospitals. *In the event that any of the partners retires, withdraws, or is expelled, he will not interfere with the partnership's contractual arrangements with the hospitals having a contractual relationship with the partnership nor will he attempt to enter into a contractual relationship with any of such hospitals.*

. . . .

If an expelled or withdrawing partner *shall assume professional responsibility for a pathology laboratory under contract to Pathology Consultants or* any of the individual partners remaining in the partnership, *he or it shall pay to Pathology Consultants an amount equal to that which the Pathology Laboratory which he or it assumes professional responsibility for paid for professional pathology services in the prior fiscal year.* The payment of said sums shall be made within twenty-four months of the date that the expelled or

withdrawing partner shall assume such a relationship.

.... (emphasis added)

█ The trial court rejected PathCon's claim that Collins interfered with the Sartori contract and, in fact, determined that Collins was careful not to do so. Instead, the court found that the contract was terminated by Sartori because of its own dissatisfaction with PathCon's performance. It went on to find that Collins did not enter into a relationship with the hospital while the PathCon-Sartori contract was in effect.

Based on our de novo review of the record, we must agree. The record is devoid of any direct evidence of overt attempts by Collins to interfere with PathCon's existing contract. Nevertheless, PathCon insists its interference claim is established by evidence of Collins' conversations with his lawyer about his rights and liabilities under the partnership agreement, his repeated contacts with a doctor friend on Sartori's staff, that same friend's actions in telling the hospital board of Collins' availability to provide pathology services and the eventual Collins-Sartori contract and its timing.

Both Collins and the Sartori doctor were consistent in their testimony that Dr. Collins did not conspire, encourage, or seek help from his friend to influence the hospital. Undoubtedly, the doctor friend was aware of the hospital's dissatisfaction with PathCon, and this knowledge as well as their close personal friendship prompted his promotion of Collins. Nonetheless, neither his actions nor Collins' failure to stop or discourage his friend from promoting him demonstrate interference by Collins.

Dr. Collins' conversations with his attorney about the parameters of the restrictions in the partnership agreement were consistent with the actions of a prudent person seeking to avoid a breach of his contract.

Most importantly, the record amply demonstrates that Sartori terminated its contract because of its own internal dissatisfaction with PathCon. Both the hospital lawyer and administrator testified that the hospital was deeply concerned about the high turnover of pathologists assigned to Sartori by PathCon. Additionally, Sartori desired greater input into the hiring and handling of hospital laboratory personnel. Finally, the board wanted to reduce PathCon's existing percentage of laboratory gross receipts. This dissatisfaction was greatly intensified by a disastrous meeting with Dr. Clark in which he refused to respond to the hospital's concerns and dictatorially issued an ultimatum about renewing the contract. After this meeting, the board began exploring other avenues of obtaining pathology services and eventually entered into a contract with Collins, P.C.

Taking the evidence as a whole and giving weight to trial court findings involving the credibility of witnesses, we agree with the trial court's conclusion that PathCon was not entitled to prevail on its claim of interference.

PathCon next contends the trial court did not address its allegations that the agreement was breached by Collins' assumption of the Sartori contract. The trial court ruled that the language in the paragraph 15 was unambiguous and obviously construed the terms to simply prohibit a departing partner from entering into a contract with any hospital that was under contract to PathCon at the time of the prohibited act. The trial court did not accept PathCon's theory that this provision was a limited covenant not to compete and that Dr. Collins was prohibited from contracting with any institution previously under contract to PathCon. We conclude the issue was addressed by the trial court. Nonetheless, we still must determine whether the trial court's construction of the contract was correct.

█ The present dispute involves both problems of interpretation and construction. Interpretation is the search for the meaning of contractual terms; construction is ascertaining their legal effect. *Fashion Fabrics of Iowa v. Retail Investors*, 266 N.W.2d 22, 25 (Iowa 1978). Interpretation is reviewed as a legal issue unless extrinsic

evidence is relied on at the trial level, while construction is always a legal matter. *Id.*

■ When interpreting the contractual terms chosen by the parties, our object is to ascertain the meaning and intention of the parties as expressed by the language used. *Allen v. Highway Equipment Company,* 239 N.W.2d 135, 138 (Iowa 1976). "The court will not resort to rules of construction where the intent of the parties is expressed in clear and unambiguous language." *Id.* at 139.

In this case, it is not surprising that the trial court ruled that the language was unambiguous since both parties claim the language is clear. PathCon did rely on extrinsic evidence showing intent, however. Specifically, Dr. Clark testified that the parties intended to prevent a departing partner from taking a hospital that had been under contract to the partnership.

■ Our examination of the record causes us to reach a different conclusion than Dr. Clark. Initially, paragraph 15 refers to the departure of a partner and prohibits interference or an attempt to contract with a hospital "having a contractual arrangement with the partnership." The penalty clause is invoked if the departing partner assumes professional responsibility for a laboratory "under contract to the partnership." The terms "having a contractual relationship" and "under contract" are phrased in the present tense contrary to Dr. Clark's claims that they applied to a hospital that previously had been under contract to PathCon. The trial court and we, on our de novo review, need afford Dr. Clark's testimony only the weight we find it entitled to. Extrinsic evidence need not be taken as a verity. *Lyon v. Willie,* 288 N.W.2d at 884, 892 (Iowa 1980). We do not accept this testimony as establishing the intention of the parties to prohibit a departing partner from contracting with a hospital that had severed its contractual relationship with the partnership. Rather, we determine these words manifest an intention to restrict a departing partner from interfering with or assuming existing contracts.

■ Moreover, we believe paragraph 15 was intended to operate as an anti-raiding provision rather than a limited covenant not to compete. There is no general restriction against competing for pathology business, only a limited restriction against interfering with or assuming a contract with a laboratory having a contractual arrangement with the partnership.

■ Additionally, paragraph 15 is not couched in the usual language of a covenant not to compete. Covenants not to compete are unreasonably restrictive unless they are tightly limited as to both time and area. *Ehlers v. Iowa Warehouse Company,* 188 N.W.2d 368, 373–74 (Iowa 1971). Although partnership attorneys were responsible for drawing the amendment, it contains no time or area limitations. Despite this telling lapse, PathCon insists (citing *Ehlers*) that we as a court of equity can enforce this provision to the extent deemed reasonable. Basically, it argues we first should construe the contract as a covenant not to compete and then imply reasonable limitations as to both time and area for what would otherwise be an unlimited restriction on competition with the partnership.

■ Contract obligations may arise from implications as well as express language; however, courts are slow to find implied covenants. *Fashion,* 266 N.W.2d at 27. Obligations by implication must arise from the language used or be indispensable to effecting the intention of the parties. *Id.* Such an implication does not arise from the language of paragraph 15 nor is it necessary to effectuate the intent of the parties. To the contrary, we conclude that failure to incorporate time and area restrictions indicates that an anti-competitive covenant was not intended.

In summary, based on our interpretation of the contract, we hold the restrictions of paragraph 15 were only intended to affect a departing partner's activities that were directed at an existing PathCon contract. Once a contract with PathCon was volun-

tarily terminated without any interference from a former partner, the departing doctor was free to contract with the other party. The trial court was correct in its determination that Dr. Collins did not breach the partnership agreement.

*II. Breach of the BHML's covenant not to compete.* In this portion of the action, BHML sought a declaratory judgment that Dr. Collins breached his deferred compensation agreement by competing with it after his withdrawal. Conversely, Collins sought judgment for the unpaid sums due under the deferred compensation agreement.

The deferred compensation agreement was a tax avoidance scheme entered into by the three original shareholders after obtaining expert advice. Each of the partners had signed identical agreements.

After he withdrew as a stockholder and employee of the corporation, Collins, for reasons of tax considerations, arranged to receive his deferred compensation in ten annual payments. Although he received the first installment, the corporation refused to make the 1981 payment. Essentially, the corporation decided Collins had forfeited the remaining unpaid deferred compensation because he had breached paragraph 11 of the agreement by competing with BHML after his withdrawal. This paragraph provides as follows:

Following the termination of his employment with the Company, the Employee agrees:

A. To render to the Company such advisory and consulting services as the Company may reasonably request, in furnishing which the Employee shall not be an employee of the Company, but shall act in the capacity of an independent contractor; and

B. *To refrain, without the express written consent of the Company, from performing services of any kind as an employee, or otherwise, to or for any person, firm or corporation whose business the Board of Directors of the Company shall in good faith determine to be competitive with the business of the Company. In the event the Employee at any time during his lifetime* either fails to render advisory or consulting services reasonably requested by the Company hereunder, or *perform[s] services for any competitor of the Company without the Company's express written consent, all amounts then remaining unpaid under this Agreement shall be forfeited and the Company shall have no liability to any person hereunder.* (emphasis added)

Under this agreement, BHML had an unlimited right to determine what constituted competition with the company and then to exact a costly penalty from the offending employee.

The trial court ruled against BHML. It found that although Collins indirectly competed with BHML by accepting referrals from physicians and other hospitals, this competition resulted from the nature of his contract with Allen and Sartori, a situation that would exist regardless of who the pathologists were at the two hospitals. According to the trial court, the hospital laboratory was the actual competitor, and while Dr. Collins worked for the hospital, there was no evidence he solicited such business or was otherwise responsible for the competition. It declared the forfeiture of the remaining funds void and ordered no further action be taken to prevent Collins from recovering the funds.

In so ruling, the court determined paragraph 11 was invalid and unenforceable for two reasons. First, the provision was a restrictive covenant, unlimited as to time and area, and thus unreasonable. Secondly, under the authority of *Van Hosen v. Bankers Trust Co.*, 200 N.W.2d 504 (Iowa 1972), pension or retirement benefit plans are not subject to forfeiture merely because the employee accepts employment with a competing institution.

In *Van Hosen* the employer, in addition to salary, provided for a private pension plan for its employees upon their retirement. The plan contained a forfeiture pro-

vision triggered on the employee's acceptance of employment with a competing institution. We pointed out that forfeitures are not favored and those seeking their enforcement must show the equities are clearly on their side so it does not impose an unconscionable burden on the employee. *Van Hosen*, 200 N.W.2d at 508. We then found as a matter of public policy that infinite forfeiture and termination of all pension rights acquired by an employee through his prior employment cannot be forfeited by the employee merely accepting employment with a competing institution since this would impose an unjust and uncivic penalty on the employee and disproportionately benefit his employer. *Id.* at 509. BHML argues that the vast majority of cases from other jurisdictions do not decide this issue as a matter of law but rather employ the same considerations that apply to covenants not to compete. We do not decide whether we will so limit our holding in *Van Hosen,* since the equities here are not in BHML's favor.

Based on our own review of the facts in this case, we find the forfeiture provision is unenforceable because the injury to the public and the harm to Dr. Collins is not outweighed by BHML's need for the restraint or the benefits it would receive from enforcement. *See Restatement (Second) of Contracts* § 188(1) (1981).

The forfeiture provision prevents the departing employee from performing services of any kind as an employee, or otherwise, to any other entity whose business the directors of BHML determines to be competitive with the business of the company. Dr. Collins and the two other shareholders effectively controlled all of the pathology services in the Waterloo area. These three doctors individually and through their partnership had pathology contracts with all of the hospitals and under these contracts performed services that were competitive to their own laboratory. As employees of the hospital, they exercised a certain amount of control over laboratory services and the referral of specimens from their employer to their own private company. Despite BHML's claims that this system saved money for the patients, it is self-evident that this system had a built-in conflict of interest between the pathologist and the hospitals. Dr. Collins left the partnership and BHML because he felt his two partners were insisting on too much income from the hospitals and too many hospital referrals to the private laboratory. Carrying the forfeiture clause to its extreme, the directors of the company could in good faith determine that any work Dr. Collins performed for Allen or Sartori Hospital was competitive with BHML. The spark that ignited this controversy and caused the directors to decide Collins was competing with the company was the fact that Sartori and Allen Hospitals expanded the scope of their laboratory services. We believe the public interest suffers when the directors of BHML can dictate to the other practicing pathologists the amount of referral work that should be sent from their employer hospital. While we doubt Dr. Collins had total control over hospital referrals, we do not believe BHML should be able to use the threat of forfeiture to force Dr. Collins to divert work to it at the expense of his employer. Such a situation is contrary to the interests of the hospital. Additionally, a monopoly on laboratory services is not in the best interests of the public. Finally, it imposes an unconscionable burden on Dr. Collins. Consequently, we disfavor this kind of leverage and find it unenforceable.

*III. Mistake.* In an amendment to their petition, plaintiffs raised the issue of mistake in the execution of the waiver of Dr. Gratton's covenants not to compete. In one count against Dr. Gratton, they alleged a unilateral mistake based on their belief Dr. Gratton would limit his practice of pathology to Allen. They further claimed the erroneous belief was a major impetus for granting the waiver and Dr. Gratton was guilty of inequitable conduct. In the next count, they alleged a mutual mistake of fact in that both parties executed the waiver on the assumption that Dr. Gratton would limit his practice to Allen. In both

counts they ask for either rescission or reformation of the waiver and other relief.

The trial court held against plaintiffs on both counts. It found no evidence of mistake on the part of Dr. Gratton or of his knowledge of any mistake or erroneous belief on the part of the plaintiffs. The court went on to conclude that Dr. Gratton did not act inequitably. In regard to plaintiffs' claimed belief, the court stated: "[T]he court doubts that at the time the release was executed, there was, in fact, any thoughts on behalf of the plaintiffs as to limitations since the facts, as they existed at that time, left only Allen Hospital for a source of Dr. Gratton's employment." On appeal, plaintiffs argue the evidence supports a conclusion that plaintiffs were unilaterally mistaken and Gratton's conduct was inequitable or, alternatively, the parties were mutually mistaken about the intended scope of Gratton's practice. No claim is made that the waiver inaccurately sets forth the terms of the agreement Dr. Gratton actually reached with his former employers.

 Under certain exceptional circumstances, mistake may be grounds for setting aside or reforming a contract. Generally, mistakes involving contracts are of three kinds. Mistakes can be made in the formation, integration or performance of a contract. *See generally* Hillman, *Contract Remedies, Equity and Restitution in Iowa*, § 5.3 et seq. (1979). Mistakes in integration occur when the parties fail to memorialize a term over which they bargained and agreed. As noted earlier, plaintiffs do not claim this type of mistake nor do they rely on a mistake in performance such as might occur when a buyer mistakenly overpays the seller for certain goods. Rather, their basis for avoiding the waiver is an alleged mistake in formation. Specifically, they claim at the time the waiver was entered into either they alone or both parties jointly assumed Gratton would limit his practice to Allen.

 Avoidance is possible where the party seeking to avoid the contract establishes that both parties are mistaken about an essential fact that was a material consideration for the contract. Restatement (Second) of Contracts § 152 (1981); *Jordan v. Brady Transfer and Storage Co.*, 226 Iowa 137, 145, 284 N.W. 73, 77 (1939). In the past, we have allowed personal injury claimants to avoid their releases when the circumstances indicate both parties were mistaken about the extent of claimant's then existing injuries. *See, e.g., Barnard v. Cedar Rapids Cab Co.*, 257 Iowa 734, 133 N.W.2d 884 (1965); *Reed v. Harvey*, 253 Iowa 10, 110 N.W.2d 442 (1961); *Jordan*, 226 Iowa 137, 284 N.W. 73 (1939). *But see, Wieland v. Cedar Rapids and Iowa City Railway Co.*, 242 Iowa 583, 46 N.W.2d 916 (1951); *Stetzel v. Dickenson*, 174 N.W.2d 438 (Iowa 1971). Likewise, such a mistake by one party coupled with fraud or inequitable conduct by the other may be grounds to avoid an agreement. *In Re Estate of Swebakken*, 251 Iowa 1358, 1362, 105 N.W.2d 610, 612 (1960).

 Not all mistakes, however, are sufficient to avoid contract. Mistake is a broad term. A mistake in the legal sense, as used here, is limited to an erroneous belief as to a then existing or past fact. *Jordan*, 226 Iowa at 144–45, 284 N.W. at 77. *See also* Restatement (Second) of Contracts § 151 Comment (a). A party's failure to anticipate future events or contingencies is not a mistake as to a then existing or past fact that would normally entitle him to relief.

 In our review of the record, we find the parties never discussed the extent of waiver or Dr. Gratton's intentions as to the scope of his future pathology practice. Prior to the split, Dr. Gratton was working exclusively at Allen Hospital. When Dr. Collins abruptly withdrew from PathCon and BHML and took Allen Hospital with him, as he had a right to do, both the partnership and the corporation were left with an extra pathologist on the payroll for whose services they had little need. Thus it was to their advantage to release him from his employment contract. Their mistaken assumption that Dr. Gratton would

limit his practice to Allen Hospital, whether present at the time of the waiver or recognized after-the-fact, was an assumption based on facts as they then existed or one that arose from an unanticipated future event. At the time of waiver, the risk of subsequent competition at some other hospital was at best a future and remote contingency. All the remaining hospitals had long been monopolized by the partnership. It may be that plaintiffs did not anticipate that in the future Gratton would work on a limited part-time basis at Sartori due to the unforeseen termination of the PathCon-Sartori contract. If they had correctly perceived future facts, they may have limited the waiver; however, in those circumstances, Dr. Gratton may have refused to terminate. In any event, we do not believe that plaintiffs now are entitled to relief merely because subsequent events dramatically altered the circumstances in which the waiver was originally executed.

 Even assuming plaintiffs can meet their burden of proof by relying on their failure to anticipate and protect against a future contingency, we believe they should bear the risk of the mistake. The court can allocate the risk of mistake to a party whenever it is reasonable to do so. Restatement (Second) of Contracts § 154(c). This situation is similar to a case where A contracts to sell a piece of farmland to B. Both parties bargain on the basis of its then existing best use and arrive at a price in terms of that use. If, after the bargain is sealed, large and valuable mineral deposits are discovered on the land, the seller bears the risk and cannot upset the contract simply because the discovery retrospectively decreased the attractiveness of his bargain. Restatement (Second) of Contracts § 154 Comment (a). Here, the plaintiffs, on their assessment of the then existing facts, misapprehended the value of Gratton's covenant not to compete. Because the likelihood Gratton would practice at other metro hospitals was remote, they gave more than they otherwise might have given in light of subsequent developments. Nevertheless, if, as they claimed, they expected Gratton to only practice at

Allen, such a limitation should and could have been easily inserted. Indeed, it is surprising the limitation was omitted since plaintiffs claim they relied on such a limitation and they were solely responsible for drafting the waiver. In the circumstances of this case, the mistake, if any, should be borne by the plaintiffs.

 Additionally, we agree with the trial court that Dr. Gratton, either directly or indirectly, was not guilty of fraud or any inequitable conduct. He made no representations to the plaintiffs and, in fact, had little contact with them on the matter of waiver. Having considered all the arguments urged by plaintiffs, we simply conclude, as did the trial court, that they failed to meet their burden of proof on the existence of either a mutual or unilateral mistake, or, alternatively, if a mistake existed, plaintiffs should bear the risk.

*IV. Pretrial evidentiary ruling concerning discovery.* During discovery, plaintiffs requested production of certain documents drafted by defendants' lawyers between December 31, 1979, and July 1, 1980. After defendants refused, the court ordered discovery, but allowed the deletion of legal conclusions since the defendants did not intend to waive their attorney-client privilege. When the plaintiffs insisted on complete production, the trial court agreed to conduct an in-camera inspection of the documents. After inspection, the court ruled that the material sought by plaintiffs was protected and should not be provided. The letters and memoranda in question were sealed by the court for purposes of appeal.

 The plaintiffs have never seen the documents and have asked this court to inspect them and determine whether the excluded documents went to a material point or constituted prejudicial error. We have examined the sealed documents as a part of our review and find no error in the trial court ruling.

In summary, based on our de novo review, the trial court did not err in rejecting

plaintiffs' various claims for relief. Accordingly, we affirm.

AFFIRMED.