Lloyd **HARMSEN**, Plaintiff-Appellant,

v.

**DR. MacDONALD'S, INC.,**
**Defendant/Cross-Appellant.**

No. 86–118.

Court of Appeals of Iowa.

Jan. 28, 1987.

Daniel J. Condon of Condon & Peavey, DeWitt, and Gary J. Rolfes, Clinton, for plaintiff-appellant.

Craig A. Levien and Therese M. Botts of Betty, Neuman & McMahon, Davenport, for defendant/cross-appellant.

Heard by DONIELSON, P.J., and HAYDEN and SACKETT, JJ.

DONIELSON, Presiding Judge.

Plaintiff landlord appeals and defendant tenant cross-appeals from the judgment in an action for breach of a lease agreement. The plaintiff asserts that under the terms of the lease agreement defendant failed to establish a right to recover upon its counterclaim that plaintiff had breached the lease agreement. The defendant asserts that the evidence was insufficient to support a finding that plaintiff exercised reasonable diligence in an attempt to mitigate damages. We affirm.

On January 21, 1981, the plaintiff entered into an agreement of lease with the defendant. The lease was for a term of five years, commencing February 1, 1981. The lease stated that the leased property was to be used as a feed mill and grain drying facility. The defendant did not start operating the leased premises until March or April 1981.

Article XI of the lease agreement provides that the landlord (plaintiff) is to deliver possession of the leased premises with the improvements free from material defects and in operating condition. In order for the defendant to properly use the facilities, the distribution head had to be in proper working order and it had to be waterproof. Though plaintiff directed that several repairs be made to the distributor head prior to the defendant's occupancy, there was a large opening in the rim of the distribution head which allowed rain water to come in, resulting in grain spoilage. In order to prevent this spoilage, the defendant had a new distributor head installed at a cost of $11,263.53.

The defendant vacated the leased premises in the spring of 1983, but continued to pay rent until November 1, 1983. The plaintiff, however, was not informed of defendant's intent to abandon the lease until December of 1983, at which time the defendant informed the plaintiff that the distributor head had been replaced. The defendant told the plaintiff it would do whatever reasonable to help in finding a new tenant. The defendant placed advertisements in the local newspaper and in *Feedstuffs*, an agricultural journal. The plaintiff also advertised the premises in August of 1984 and put up several "for rent" signs on the premises. Though plaintiff was not successful in leasing the entire property,

some storage bins were leased for the sum of $2,000.00.

Plaintiff filed the present action in June 1984 to recover unpaid rent owing under the lease. The defendant contended that plaintiff had failed to mitigate his damages. The defendant also counterclaimed, alleging that the plaintiff had breached the lease agreement by failing to deliver the premises free from material defect. The trial court held that the plaintiff was entitled to the unpaid rent and that the plaintiff had shown due diligence in mitigating his damages. The trial court also ruled in favor of the defendant on its counterclaim for breach of contract.

Our scope of review is limited to the correction of errors at law. Iowa R.App.P. 4. We are bound by the trial court's findings of fact if supported by substantial evidence. Iowa R.App.P. 14(f)(1). We are not, however, bound by the trial court's determinations of law.

■ We first address plaintiff's argument on appeal that the trial court erred in holding that the defendant was entitled to recover upon its counterclaim alleging that plaintiff had breached the terms of the lease. The plaintiff contends that the defendant is barred from recovery because it did not inform him of the defect in the distributor head until December of 1983. The plaintiff contends that the defendant had a reasonable duty within a reasonable time after the discovery of the defect to inform the plaintiff of the defect, citing for support Iowa Code section 554.2607 (1985). However, Article 2 of the Iowa Uniform Commercial Code, sections 554.2101, *et seq.*, does not apply to lease agreements. The sections were intended to apply to transactions in goods, Iowa Code section 554.2102 (1985), and are intended to govern transactions between buyers and sellers. Iowa Code §§ 554.2103(1)(a), (d) (1985). Therefore, the statutory notice restrictions imposed by the Uniform Commercial Code are not applicable to the present case.

The plaintiff also contends that the trial court erred in applying the accepted rules of contract construction to the parties'

lease agreement because the terms of the agreement were clear and unambiguous. When interpreting the contractual terms chosen by the parties, our object is to ascertain the meaning and intention of the parties as expressed by the language used. *Pathology Consultants v. Gratton*, 343 N.W.2d 428, 434 (Iowa 1984). "The court will not resort to rules of construction where the intent of the parties is clear and unambiguous language." *Allen v. Highway Equipment Co.*, 239 N.W.2d 135, 139 (Iowa 1976). Where, however, language is of doubtful meaning or if difficult conclusions may be drawn from the evidence, the court will resort to rules of construction. *Rector v. Alcorn*, 241 N.W.2d 196, 202 (Iowa 1976) (citing *Brammer v. Allied Mutual Insurance Co.*, 182 N.W.2d 169, 172 (Iowa 1970)). In the construction of written contracts, the cardinal principle is that the intent of the parties must control, and except in cases of ambiguity, this is determined by what the contract itself says. Iowa R.App.P. 14(f)(14).

Article XI of the lease agreement provides in pertinent part:

> Landlord shall be required to deliver possession of the demised premises to Tenant with all improvements and personal property thereon free from material defects and in operating condition capable of milling grain, with such property including, but not limited to, the scale, leg (for grain distribution), bulk bins, overhead storage bins, augers, electrical motors, farm tractor (including loader and mower), and two and one-half ton GMC delivery truck. In addition, Landlord will replace an overhead door at the South end of the scalehouse. Landlord will also retain and pay James Wisor to supervise, repair and start up, and to instruct tenant's employees in the operation of the demised premises during Tenant's first two weeks of occupancy thereof. Thereafter the cost of repair for such improvements and personal property shall be borne by Tenant.

The plaintiff contends that the terms of the lease are clear and unambiguous. Accord-

ing to the plaintiff, he was required to pay James Wisor to supervise, repair, start up, and instruct the defendant's employees in the operation of the premises for the first two weeks of occupancy. Thereafter, the cost of repair or improvements were to be borne by the defendant. We disagree.

Iowa courts have soundly rejected any theory that, absent an agreement, the landlord warrants that leased property will be suitable for the purpose for which it is rented. *Knapp v. Simmons*, 345 N.W.2d 118, 121 (Iowa 1984). However, in the present case, the terms of Article XI of the lease agreement specifically state that the landlord (plaintiff) is required to deliver possession of the premises to the tenant (defendant) with all improvements and personal property free from material defects and in operating condition.

The record shows that in order for the defendant to use the facility for the stated purposes that it was necessary that the distribution head be in proper condition. James Wisor testified at trial that in order to be in operating condition the distributor head had to be waterproof and that he could not recall whether he had examined the distributor head for cracks. Though some welding was apparently done to patch up some of the rusted areas on the pipes of the distributors, the crack in the bottom of the distributor had still allowed water to seep into the grain bins, resulting in a significant amount of grain being spoiled. To correct this situation, the defendant had to install a new distributor head at a cost of $11,263.53.

■ A careful review of all the testimony offered at trial leads us to conclude that the distributor head was not fit for the purposes intended. The defendant utilized the distributor head as it existed when the defendant began its operations, and as a result, rain water leaked through a large crack in the rim of the distributor head, causing grain spoilage. When defendant was first shown the facilities, it was told only that the distributor head was loose and somewhat out of alignment. Though the defendant did not tell the plaintiff about the need to replace the distributor head, we agree with the trial court that plaintiff made no showing that he was prejudiced thereby. We believe that it was reasonable under the circumstances for the defendant to replace the distributor head, and we hold that the trial court was correct in ordering that the defendant was entitled to judgment on its counterclaim in the amount of $11,263.53.

The defendant on appeal contends that the trial court erred in holding that the plaintiff exercised reasonable diligence in attempting to lease the property to mitigate damages after the abandonment of the lease by the defendant. We disagree.

■ Under Iowa law, "when a tenant wrongfully abandons leased premises, the landlord is under a duty to show reasonable diligence has been used to relet the property at the best obtainable rent and thereby obviate or reduce the resulting damage." *Vawter v. McKissick*, 159 N.W.2d 538, 541 (Iowa 1968). The duty of a lessor to use reasonable diligence to relet the wrongfully abandoned property does not arise until lessor has reason to know of the abandonment. *Friedman v. Colonial Oil Co.*, 236 Iowa 140, 143–44, 18 N.W.2d 196, 198 (1945). Nor is the lessor required to adopt any specific method in endeavoring to relet the property. *Id.* The burden of proof, however, is on the lessor to show diligence in reletting the property. *Vawter*, 159 N.W.2d at 542.

In the present case, the record reveals that the plaintiff was aware that the defendant intended to fully and finally abandon the lease in December 1983, at the same time the plaintiff learned that the defendant had not paid any rent after November 1, 1983. The defendant told the plaintiff that it would do whatever was reasonable to help find a new tenant, and the plaintiff relied on this promise. From the record it is apparent that while the defendant was no longer going to pay rent, it was going to try to sublease the property. The defendant placed several ads in the *Feedstuffs* magazine and the *Quad City Times* newspaper. The record also

reveals that the defendant's sign appeared on top of the leased premises for over a year after the defendant had vacated the premises in the spring of 1983.

The defendant also had continual access to the leased premises and did not return the keys to the plaintiff until a day before trial. Additionally, John Shields, the defendant's vice-president of administration, testified at trial that he finally and clearly indicated to the plaintiff that the defendant had no desire to retake control of the facility on March 8, 1984, over three months after the defendant had informed the plaintiff of its intention to abandon the lease.

In August of 1984, the plaintiff, upon advisement from his attorney that he had a duty to mitigate damages, ran a series of ads in *Feedstuffs* magazine on August 13th, 20th, 27th, and September 3rd of 1984, in the local *Busy Bee*, and the *Quad City Times*. The plaintiff also erected several "for rent" signs on the property, though the signs were not particularly large or eye-catching. About a month before trial, the plaintiff advertised his property as usable for the storage of feed and received a response from a tenant who leased two bins for the storage of grain. The plaintiff also testified at trial that it was his wish to actually sell the property to the defendant, but did not list the property for sale at any time.

■ Upon a consideration of all the circumstances, we believe that the trial court was correct in holding that the plaintiff exercised reasonable diligence in attempting to lease the property to mitigate damages. Though the defendant informed the plaintiff in December 1983 that it was abandoning the lease, the defendant did not conclusively state this to the plaintiff until March of 1984. The defendant told the plaintiff it would do whatever was reasonable until a new lessee was found. Despite its stated intention to exercise no control over the premises, the defendant still had complete access to the buildings, did not remove its sign until a year after it decided to vacate the property, and did not return the keys until a day before trial. Despite

its intention to abandon, the defendant continued to search for new tenants through May of 1984. After it became clear to the plaintiff that it was his duty to mitigate damages, he promptly took out a series of ads in well-read circulations, put up several signs on the property, and eventually obtained a rental of several grain storage bins. Based on these facts, we cannot say that the trial court erred in holding that the plaintiff exercised reasonable diligence in seeking to mitigate his damages by reletting the premises. We therefore affirm the trial court's judgment for the plaintiff against the defendants in the sum of $20,134.91 for unpaid rent and reimbursement for property insurance paid by the plaintiff on behalf of the defendant.

AFFIRMED.