# IN THE COURT OF APPEALS OF IOWA

No. 3-1196 / 12-1490
Filed February 5, 2014

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**ERIC SCOTT OLSEN,**
      Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Gary D. McKenrick, Judge.

Eric Olsen appeals his convictions for homicide by vehicle and leaving the scene of an accident. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kyle P. Hanson, Assistant Attorney General, Michael H. Walton, County Attorney, and Kim Shepherd, Assistant County Attorney, for appellee.

Considered by Doyle, P.J., and Tabor and Bower, JJ.

**DOYLE, P.J.**

Eric Olsen appeals his convictions for homicide by vehicle-recklessness, in violation of Iowa Code section 707.6A(2)(a) (2011), and leaving the scene of a fatality accident, in violation of sections 321.261 and 321.263. Olsen claims the evidence was insufficient to support the jury's findings of guilt. Olsen also takes issue with several evidentiary rulings by the district court. We affirm.

**I.      *Sufficiency of the Evidence***

The jury was instructed that the State would have to prove the following elements of homicide by vehicle:

> 1. On or about the 17th day of January, 2011, the defendant operated a motor vehicle in a reckless manner.
> 2. The defendant's recklessness unintentionally caused the death of Wanda Weldy.

The jury was instructed that the State would have to prove the following elements of leaving the scene of a fatality accident:

> 1. On or about the 17th day of January, 2011, the defendant was the driver of motor vehicle which was involved in an incident which resulted in the death of another person.
> 2. The defendant knew that the other person suffered serious injury or death.
> 3. The defendant left the scene of the incident.
> 4. The defendant:
>> a. Did not leave his driver's license, automobile registration receipt, or other identification information at the scene of the incident; or,
>> b. Did not report the incident promptly to law enforcement authorities and:
>>> i. Did not return to the scene immediately; or
>>> ii. Did not inform law enforcement authorities where he could be located.

The jury was further instructed on the meaning of the terms "reckless" and "serious injury":

A person is "reckless" or acts "recklessly" when he willfully disregards the safety of persons or property. It is more than a lack of reasonable care which may cause unintentional injury. Recklessness is conduct which consciously is done with willful disregard of the consequences. For recklessness to exist, the act must be highly dangerous. In addition, the danger must be so obvious that the actor knows or reasonably should foresee that harm more likely than not will result from the act. Though recklessness is willful, it is not intentional in the sense that harm is intended to result.

A "serious injury" is a bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or extended loss or impairment in the function of any bodily part or organ. "Serious injury" includes death. The term "bodily injury" means physical pain, illness or any impairment of physical condition.

For the defendant to know or have knowledge of something means he had a conscious awareness that Wanda Weldy suffered bodily injury, serious injury, or death.

Viewing the facts in the light most favorable to its verdict, *see State v. Thompson*, 836 N.W.2d 470, 474 (Iowa 2013), the jury could have found the following. Olsen was drinking at the Pour House bar in Davenport with his "on and off" girlfriend, Wanda Weldy on January 17, 2011. A surveillance video depicted Olsen and Weldy leaving the bar at 1:37 a.m. Nearby, at approximately 1:50 a.m., Mark Burns was awakened by loud engine noises in his front yard at 2806 North Fairmount Street. Burns looked out the window and saw Olsen's blue pickup truck in the yard. The truck was stuck, and the driver was revving the engine and spinning the wheels trying to get free. After about one minute, the truck got out of the yard and squealed its tires as it left, driving northbound on Fairmount Street. Burns saw the truck turn right onto West 29th Street.

Within one minute, Burns—still looking out his window—noticed another pickup truck driving north on Fairmount Street. The truck stopped in front of his parents' house, a few doors south of Burns's house, on Fairmount Street. At that

point, Burns woke up his wife, told her "something is going on around here," and ran outside.

The driver of the second truck, Ryan Uhle, was driving home on Fairmount Street when he spotted what he thought was a garbage bag in the road. As he got closer, Uhle realized it was a body (Wanda Weldy) and a shoe lying in the road. Uhle stopped his truck and tried to rouse Weldy before running to a nearby house (Burns's parents) to call police. By that time, Burns had run over from his house. Burns asked Uhle what happened, and checked Weldy's condition. Weldy had no pulse, was not breathing, and was covered in blood. An ambulance arrived and rushed her to the hospital.

An autopsy performed on Weldy's body indicated a black, smudgy substance on her chest and head in a grid-like pattern. A doctor opined that with her injuries, Weldy would have died relatively rapidly, within minutes. Her cause of death was determined to blunt force trauma. The doctor confirmed Weldy's injuries were consistent with her being run over by a motor vehicle, noting the black grid-like pattern on her body appeared to be tire tread. The injuries aligned on one side of her body, consistent with one continuous process of injury.

At the scene, police found and diagrammed fresh tire marks on the road and in the plowed snow indicating a vehicle had made a U-turn from northbound to southbound on Fairmount Street, accelerated at the intersection of Fairmount Street and West 29th Street, and then changed direction again in Burns's yard at 2806 Fairmount Street. Police also diagrammed a blood spot and a shoe lying in the road near Burns's parents' house at 2715 Fairmount Street. An evidence technician took a cast of the tire tracks in the snow. Weldy's clothing did not

have tearing or scraping to be expected if she had slid or rolled on the pavement. Her jeans had a black substance in a pattern that ran up the leg. Marks on her body were consistent with being caused by a tire. Police opined the evidence did not support a theory that Weldy had "alighted" from a moving vehicle, but rather that she was lying on the ground when she was run over.

Meanwhile, at 2:01 a.m., a security guard at a local hospital saw a person park a blue pickup truck and "power walk" away from the hospital. The truck was determined to be registered to Olsen; it matched the description of the truck Burns had seen in his yard; its tire treads were consistent with the tire tracks on Fairmount Street and Weldy's body. Shoeprints on the inside of the windshield and passenger window were consistent with the sole pattern of Weldy's shoes.

Later that morning, police found Olsen in a home near the hospital where his truck was parked. Olsen never reported an accident to police. In an interview with police, Olsen lacked emotion considering he claimed he had just learned about his girlfriend's death. Olsen claimed he was driving Weldy to Wal-Mart when she jumped out of his moving truck. He said he turned around, but she did not want to get back in the truck. Olsen said, "[I]f somebody jumps out of a truck at 35, 40 miles per hour they can break their leg, they can break their neck, anything can happen to them." He said Weldy had also jumped out of the truck the previous Thursday. Police noted several discrepancies in that story compared to statements he made during various jail phone conversations, including that he did not see Weldy when he backed out of the yard and he thought he might have run her over and that Weldy might have gotten caught in the seatbelt and hit her head. Olsen did not testify at trial. His defense theory

was that Weldy got angry and jumped out his truck; when he turned around he did not see her so he assumed she ran away.

On appeal, Olsen contends "[o]ne has to speculate about whether Olsen was reckless in the operation of his vehicle and, even if he were, if his actions were the cause of Weldy's death" where

> other cars were driving on the road, the body was not located by where Olsen drove into the yard, there was the possibility Weldy was mobile after she left the vehicle, there was no evidence of damage to Olsen's vehicle, and any evidence tying Olsen's truck tires to Weldy's injuries was inconclusive.

He further claims "one has to speculate about whether Olsen even hit Weldy and, more importantly, if he knew how badly she was injured."

Viewing the evidence in the light most favorable to the State, we are persuaded that a reasonable juror could have found Olsen's reckless driving caused Weldy's death, and that Olsen knew he had been in an accident capable of causing Weldy's death. *See State v. Biddle*, 652 N.W.2d 191, 197 (Iowa 2002) (setting forth standard of review in challenges to the sufficiency of the evidence supporting a guilty verdict). We affirm, finding substantial evidence supports the jury's finding of guilt.

Olsen also claims the district court abused its discretion in denying his motion for new trial. At trial, the State and Olsen presented conflicting evidence as to the circumstances of the incident and the cause of Weldy's death; the jury chose to believe the State's evidence. Olsen requested a new trial on the basis of insufficiency of evidence, claiming "the credible evidence is the evidence presented by the defense." The district court rejected the claim, stating:

With respect to the issue of whether the verdicts were contrary to the weight of the evidence, the Court starts with the rule that the jury may believe all, part or none of any witness's testimony. Looking at the evidence in its entirety, and with the view towards the evidence supporting the verdicts, the Court does conclude that the weight of the credible evidence does, in fact, support the verdicts rendered by the jury in this matter, and therefore, the Motion for New Trial with respect to that issue will be overruled . . . .

We conclude the court properly exercised its discretion in its ruling. *See State v. Reeves*, 670 N.W.2d 199 (Iowa 2003) ("The district court has broad discretion in ruling on a motion for new trial."); *State v. Ellis*, 578 N.W.2d 655, 658-59 (Iowa 1998) (stating the district court may grant a motion for new trial "[i]f the court reaches the conclusion that the verdict is contrary to the weight of the evidence").

## II.      Evidentiary Rulings

Olsen takes issue with several evidentiary rulings by the district court, claiming the court abused its discretion in (1) excluding evidence of a prior act by the victim, (2) admitting evidence of Olsen's prior domestic abuse of the victim, and (3) denying access to the victim's mental health records.

### A.      Exclusion of Evidence Regarding the Victim's Character

Olsen appeals the district court's refusal to admit evidence of a specific instance he claims would have supported the theory that Weldy jumped out of his truck by "her own free will." He presented an offer of proof of a February 2010 incident during which he and Weldy were arguing in the backseat of his friend's car when Olsen told the friend to stop the car because Weldy had "hopped out" while the car was moving. Olsen's friend acknowledged he did not see what happened before Weldy went out the car door, who opened the door, and what Olsen was doing at the time Weldy went out the door.

The district court excluded the proffered evidence, determining it was improper character evidence. *See* Iowa Rs. Evid. 5.404(a)(2)(A) ("Evidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except . . . evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same . . . ."), 5.405(b) ("In cases in which character or a trait of character of a person is an *essential element of a charge*, *claim*, *or defense*, proof may also be made of specific instances of the person's conduct." (emphasis added)); *State v. Jacoby*, 260 N.W.2d 828, 837 (Iowa 1977) ("[W]here the accused denies the killing or asserts it was unintentional, evidence of the deceased's character is inadmissible"). We conclude the evidence was properly excluded.

B.     *Admission of Evidence Regarding Olsen's Prior Abuse of the Victim*

Olsen appeals the district court's admission of evidence of his prior acts of violence toward Weldy, claiming none of the charges submitted to the jury required the State to prove Olsen's specific intent, and even if the evidence was relevant, the danger of unfair prejudice "far outweighed" its probative value. Olsen takes issue with the following evidence: testimony from the paramedic who responded to the scene on January 17, 2011, that he recognized Weldy from a different incident on January 13, 2011, when he had responded to a domestic assault call and Weldy had told him she had been "pushed out of a truck"; testimony from police who responded to a domestic assault call at Olsen's house on January 12, 2011, after Olsen threw Weldy to the ground when she came to retrieve her belongings; and testimony from police who responded to a report of

domestic assault involving Olsen and Weldy in November 2010 and saw Weldy with scratches and blood on her face.

The district court allowed the testimony, with a cautionary instruction, determining it was admissible evidence of other bad acts. The court stated "the incidents are relevant to establish the volatile and violent nature of the relationship between the defendant and the alleged victim," "would tend to help establish motive, intent, or absence of mistake or accident," and "occurred within approximately two months of the alleged victim's death." The court concluded "the highly probative nature of the three incidents . . . substantially outweighs any danger of unfair prejudice to the defendant, particularly when coupled with an admonishment to the jury concerning the purpose for which such evidence may be offered along with an instruction setting forth its limited utility."[1] *See* Iowa R. Evid. 5.403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."), 5.404 ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."); *State v. Rodriquez*, 636 N.W.2d 234, 242 (Iowa 2001)

---

[1] The jury received the following limiting instruction in regard to the evidence at issue:
> Each of the new three witnesses that are being called by the state are going to offer testimony concerning incidents which occurred prior to January 17th, 2011. Evidence concerning those incidents is not admissible to prove the character of Mr. Olsen or that Mr. Olsen acted in conformity with the actions that are alleged to have occurred in connection with those incidents. That evidence is being offered merely for the purpose of showing that what occurred on January 17th was not a mistake or accident.

(allowing evidence of prior assaults against same victim where the defendant claimed the injuries he inflicted on the victim that day were "unintended" and his prior bad acts made it "more probable" that his actions constituted an element of the crime at issue). Here, Olsen's defense was that Weldy voluntarily jumped from his moving vehicle and was accidentally or mistakenly run over. We conclude the district court properly exercised its discretion to permit evidence of prior domestic abuse of Weldy by Olsen.

C.      *Denial of Access to Victim's Mental Health Records*

Olsen appeals the district court's denial of his motion to compel production of Weldy's mental health records, claiming the records would have supported a finding that Weldy "had a history of jumping out of vehicles" and "would make it more likely that Weldy voluntarily jumped out of Olsen's vehicle on the night in question." Prior to trial, the district court conducted an in camera review of Weldy's medical records from Genesis Medical Center from March 8, 2000, through January 17, 2011, and from Vera French Community Mental Health Center from September 27, 2005, through December 1, 2010.[2] The court determined the records did not contain exculpatory information, and that to the extent any information was exculpatory, Weldy's privacy interests outweighed Olsen's need for disclosure.

---

[2] In April 2013, the Iowa Supreme Court entered an order allowing appellate counsel access to Olsen's January 2012 motion to compel and the State's February 2012 resistance to that motion. Those filings, along with the district court's order denying Olsen's motion to compel, are included in a sealed appendix before this court for purposes of this appeal, which we have reviewed and considered in reaching our conclusion on this issue.

Olsen claims the court's ruling makes it "impossible for an appellate court to . . . know whether the court determined there was no exculpatory evidence at all, or whether there was some exculpatory evidence that did not warrant limited disclosure." Our supreme court, however, has not interpreted Iowa Code section 622.10(4), which sets forth the protocol for criminal defendants' access to potentially exculpatory mental health records of their alleged victims, to require the district court to make the written findings Olsen claims were necessary here. Indeed, section 622.10(4)(a)(2)(d) provides:

> Upon the court's determination, *in writing*, that the privileged information sought *is exculpatory and that there is a compelling need for such information that outweighs the privacy interests of the privilege holder*, the court shall issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information.

(Emphasis added); *see Thompson*, 836 N.W.2d at 490 (holding section 622.10(4) "is constitutional on its face"). Here, the district court determined Weldy's privacy interests outweighed Olsen's need for any exculpatory information, and issued its ruling denying access to the records. We conclude the court properly applied section 622.10(4) in determining whether to allow access to the confidential medical records at issue.

Alternatively, Olsen asks this court to conduct an in camera review of the medical records at issue. Our appellate courts have routinely conducted in camera reviews of confidential materials in addressing claims on appeal concerning the district court's discovery rulings. *See, e.g.*, *Otteson v. Iowa Dist. Court for Linn Cnty.*, 443 N.W.2d 726, 729 (Iowa 1989); *Pathology Consultants v. Gratton*, 343 N.W.2d 428, 438 (Iowa 1984). We have thoroughly examined the

sealed documents as a part of our review and agree with the district court's determination that no exculpatory information is contained therein. Therefore, we find no abuse of discretion in the district court's ruling . *See Thompson*, 836 N.W.2d at 476 ("Nonconstitutional challenges to discovery rulings are reviewed for abuse of discretion.").

To the extent Olsen claims violations involving the right to present a defense based on the denial of access to Weldy's medical records to his trial or appellate counsel, we review those claims de novo. *Id.* at 476. We find these claims unpersuasive under our supreme court's recent ruling in *Thompson*, 836 N.W.2d at 476, 486 (holding the criminal defendant does not have state or federal due process right "to an in camera inspection by his own lawyer").[3]

Having considered the issues raised on appeal, we affirm Olsen's judgment and sentence for homicide by vehicle and leaving the scene of a fatality accident.

**AFFIRMED.**

---

[3] Insofar as Olsen claims his counsel was ineffective in failing to gain access to Weldy's medical records, we conclude Olsen is unable to prove this claim where trial counsel sought—albeit unsuccessfully—access to those records.