# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3568

_____

| | | |
|---|---|---|
| Edmund B. Eisnaugle, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa |
| | * | Eastern Division. |
| John Deere Health Care, Inc., | * | |
| As Administrator and Fiduciary | * | [UNPUBLISHED] |
| of a Welfare Benefit Plan, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: May 18, 2001

Filed: June 14, 2001

_____

Before McMILLIAN, BOWMAN, Circuit Judges, and MOODY,[1] District Judge.

_____

PER CURIAM

Plaintiff Edmund B. Eisnaugle filed suit against Defendant John Deere Health Care, Inc. ("JDHC") alleging (1) breach of fiduciary duty and estoppel under ERISA; (2) fraudulent misrepresentation; (3) negligent misrepresentation; and (4) breach of

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas, sitting by designation.

contract. Eisnaugle appeals from the District Court's[2] entry of summary judgment in favor of JDHC and the Court's denial of his cross-motion for summary judgment. We affirm.

## Background

JDHC began affiliating with physicians in the 1990's through a division of JDHC called Physician Practice Management. The physicians' practices were incorporated as professional corporations and generally used the words "Cornerstone Group" as part of their corporate name. As a result of an affiliation, JDHC would provide a physician's practice with management and administrative services, including paying the physician's salary and benefits. JDHC would not, however, acquire any ownership interest in the practice or become the employer of the physician. JDHC would merely enter into a "management agreement" with the incorporated practice in exchange for a fee.

After an initial contact, JDHC sent Dr. Edmund Eisnaugle draft documentation by which JDHC proposed to affiliate with a practice that Eisnaugle would incorporate under the name Cornerstone Medical Group of Waverly, P.C. ("CMG Waverly"). On October 30, 1996, Dr. Eisnaugle incorporated CMG Waverly. On the same day, JDHC and CMG Waverly entered into a Management Agreement. As part of the Management Agreement, JDHC and CMG Waverly executed a borrowing agreement under which JDHC would loan funds to CMG Waverly to cover working capital and CMG Waverly agreed to repay those loans on demand with interest. CMG Waverly executed an employment agreement with Eisnaugle under which CMG Waverly agreed to pay Eisnaugle a salary and to provide him with benefits. Dr. Eisnaugle's salary and benefits were negotiated by JDHC prior to and in conjunction with the Management

---

[2] The Honorable John A. Jarvey, United States Magistrate Judge for the Northern District of Iowa, Eastern Division.

Agreement.

Kevin Pitzer, an employee of JDHC, was authorized to offer the salary and benefits package to Eisnaugle which included short-term and long-term disability insurance. When discussing the benefits proposal, Pitzer told Eisnaugle that he was eligible for disability coverage on his employment date of January 1, 1997 provided he completed and submitted all the applications. Pitzer did not tell Eisnaugle that he would have to qualify or be approved for the disability insurance. Pitzer was not aware that anyone told Eisnaugle he would have to qualify or be otherwise approved for the disability insurance. Under the Management Agreement, CMG Waverly could not secure payroll and benefits administration from anyone other than JDHC.

Katherine Pearson, also an employee of JDHC, coordinated Eisnaugle's enrollment for disability insurance. On December 13, 1996, she sent Eisnaugle the proper enrollment forms with instructions to complete them and return them to her. Eisnaugle completed his enrollment for disability insurance under CNA's Income Protection Plan on December 18, 1996. Pearson acknowledged receipt of the enrollment forms on December 20, 1996. She checked the forms and forwarded them to All Staff, a benefits administration company hired by JDHC to provide employee benefits administration for affiliate practices. On January 16, 1997, Pearson sent Eisnaugle a note stapled to a Certificate of Insurance for Group Long Term Disability. Eisnaugle assumed that his benefits were effective on January 1, 1997.

Dr. Eisnaugle developed vision problems and first saw an opthamologist in October, 1997. His vision had decreased to the point that the doctor advised him it was not safe for him to drive by himself. The Social Security Administration found Eisnaugle disabled due to dementia and statutory blindness with an onset date of October 20, 1997. Eisnaugle claims that he sent Katherine Pearson a letter on October 29, 1997, notifying her of his disability. Pearson denies receiving this letter.

On November 12, 1997, Jon Chapman and George Dellos of JDHC met with Eisnaugle to discuss termination of the relationship between JDHC, CMG Waverly, and Eisnaugle. Chapman gave Eisnaugle a proposed Settlement Agreement and Release which provided for termination of the Management Agreement and dissolution of CMG Waverly. JDHC made several propositions to Eisnaugle, including an offer to continue paying his salary and bonus payments through December 31, 1997. JDHC also agreed to forgive a debt of $215,000 incurred by CMG Waverly since January 1, 1997. In exchange, the release portion of the Settlement Agreement provided in part that JDHC, CMG Waverly, and Eisnaugle would mutually and forever release and discharge each other from any and all claims known or unknown.

Eisnaugle took a copy of the Settlement and Release to his attorney, Jay Roberts, for advice before signing the document. Roberts wrote Dellos on November 14, 1997 advising of his understanding of the offer. Roberts also raised the need to discuss health care coverage in the Settlement: "You must know of the extreme health problems that he, Sandy, and the family have had that would make it virtually impossible for them to gain health coverage in the future."

After receiving the letter, Dellos contacted Eisnaugle. Dellos told Eisnaugle that he had received a letter from Roberts and asked Eisnaugle about Roberts' role in the settlement negotiations. Eisnaugle allegedly indicated that JDHC should not be concerned about the letter and that he was interested in a cash payment under the Settlement and Release Agreement.

JDHC prepared a second proposed Settlement Agreement. The release language was identical to the original Settlement Agreement. The second Agreement terminated all previous agreements between the parties as of November 18, 1997, provided Eisnaugle with salary and bonus through December 31, 1997, a cash payment of $85,000, and COBRA health insurance benefits beginning January 1, 1998. Under the Agreement, Dr. Eisnaugle was required to assume responsibility for the health

-4-

insurance payments. Disability benefits were never discussed. Dr. Eisnaugle signed the second Settlement Agreement and Release (the "Settlement Agreement") on November 18, 1997 against the advice of his counsel.

By letter dated December 31, 1997, Eisnaugle's attorney, Jay Roberts, informed JDHC that Eisnaugle intended to make a disability claim. William Zessar, General Counsel for JDHC, responded by letter dated February 17, 1998 that Eisnaugle's application for disability coverage was never forwarded by All Staff to CNA, and that Eisnaugle did not meet the eligibility requirements for disability benefits because he had not been a "full time" employee. According to the record, Eisnaugle did not work 30 hours per week performing the duties of his "regular occupation" during 1997 as required to be considered a "full time" employee under the CNA policy.

On March 23, 1998, Roberts again wrote to Zessar regarding Dr. Eisnaugle's health insurance. Zessar responded two days later with information that Eisnaugle had not submitted an application for COBRA health insurance and he had not paid the premium within the appropriate time period. Roberts wrote to Zessar again stating, "[Eisnaugle] has made every reasonable effort to have health insurance and assert his rights under COBRA. That needs to be reinstated as of January 1 and all bills covered appropriately under that policy." On April 14, 1998, JDHC agreed to reconsider its decision denying COBRA benefits. On April 16, 1998, Roberts submitted Eisnaugle's application for COBRA coverage.

Discussion

We review a grant of summary judgment de novo. The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992); St. Paul Fire & Marine Ins. Co. v. FDIC, 968 F.2d 695, 699 (8th Cir. 1992). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076 (8th Cir. 1980). The nonmoving party may not merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. Burst v. Adolph Coors Co., 650 F.2d 930, 932 (8th Cir. 1981).

In its motion for summary judgment, JDHC argued that all of Dr. Eisnaugle's claims were barred by the Settlement Agreement. JDHC contended that the language releasing "any and all claims, known and unknown" covered Eisnaugle's claim for disability insurance. In his cross-motion, Eisnaugle argued that the Settlement Agreement should be set aside for three reasons: (1) JDHC violated the legal canon of ethics by contacting Dr. Eisnaugle directly instead of contacting his attorney; (2) JDHC fraudulently misrepresented to Dr. Eisnaugle that his disability insurance was effective January 1, 1997; and (3) the Settlement Agreement was entered into under a mutual mistake of both parties.

The district court found Eisnaugle's argument regarding JDHC's ethical violations to be without merit. Further, the Court found that Eisnaugle's failure to return the consideration paid by JDHC under the Settlement Agreement and his ratification of the Agreement after learning of JDHC's failure to provide disability insurance precluded Eisnaugle from claiming fraud or mutual mistake. The court granted JDHC's motion for summary judgment based upon the release language of the Settlement Agreement.

"There is nothing in the nature of a compromise contract, a release of liability, or a covenant not to sue, that calls for any different construction or treatment at the

hands of a court, than that accorded to other contracts." *Jordan v. Brady Transfer & Storage Co.*, 284 N.W. 73, 82 (Iowa 1939). In order to set aside a contract, or release, for fraud or mistake, the injured party must take certain steps. "'The power of avoidance for fraud or misrepresentation is lost if the injured party after acquiring knowledge of the fraud or misrepresentation manifests to the other party to the transaction an intention to affirm it or exercises dominion over the things restoration of which is a condition of his power of avoidance.'" *Test v. Heaberlin*, 118 N.W.2d 73, 75 (Iowa 1962)(quoting with approval Restatement (First) of Contracts, § 484 (1982)) .

"Iowa has followed the long-standing rule that when a contract is procured by fraud by one party, the defrauded party may elect to rescind the contract or affirm it and pursue an independent claim for damages. The rescission must be elected promptly, and requires a party to restore the benefits received under the contract." *Phipps v. Winneshiek County*, 593 N.W.2d 143, 145 (Iowa 1999)(citing *Test v. Heaberlin*, 254 Iowa 521, 524-25, 118 N.W.2d 73, 75 (1962) and *Mills County State Bank v. Fisher*, 282 N.W.2d 712, 714 (Iowa 1979)).

> If [a defrauded party] does nothing; if he remains silent and takes no action, his very silence and his retention and use of the purchase money for any considerable length of time after discovery of the fraud constitute a complete, irrevocable ratification of his contract, and make it as binding and effectual as though he had deliberately entered into it after full knowledge of all the facts, uninfluenced by any fraudulent practices.

*Rugan v. Sabin*, 53 F. 415, 418 (8th Cir. 1892).

Dr. Eisnaugle cites *Reddington v. Blue & Raferty*, 149 N.W. 933 (Iowa 1914) as authority for his argument that return of the consideration is not a prerequisite to his action for rescission. He argues that it would be inequitable under the facts of this case

to compel return of the consideration. In *Reddington*, the plaintiff settled a personal injury dispute with his employer pursuant to a written release. After learning that his injuries were permanent rather than temporary as thought at the time of the release, plaintiff filed suit against his employer for damages. Plaintiff did not return the consideration paid by his employer under the release. Nonetheless, the court allowed the plaintiff to avoid the release by reason of mutual mistake. The court acknowledged that in most cases return of consideration is necessary before rescission may be had, however, the doctrine does not apply in all cases. The court explained: "If nothing was received in virtue of the settlement and compromise, as the testimony tends to show in this case, or if money was paid, and it was given for injuries in fact received, and was not intended to cover anything else, but by reason of mutual mistake the agreement was made to cover injuries not contemplated by either of the parties, then no return of the money received is necessary." *Id*. at 936.

In the instant case, Eisnaugle not only retained the consideration but he also ratified the Agreement by enforcing its terms. In other words, the Court need not decide whether Dr. Eisnaugle's failure to return the consideration was fatal to his claim to set aside the Agreement because he also enforced the terms of the Agreement after acquiring knowledge of JDHC's alleged fraud or mutual mistake. Therefore, the Court finds that Dr. Eisnaugle's enforcement of the medical coverage provided by the Settlement Agreement after discovering JDHC's failure to provide disability coverage constitutes a complete, irrevocable ratification of the Agreement. For this reason, Eisnaugle is barred from claiming fraudulent misrepresentation or mutual mistake in the procurement of the Settlement Agreement.

## Conclusion

For the reasons discussed above, we affirm the order of the district court granting JDHC's motion for summary judgment and denying Dr. Eisnaugle's cross-motion. JDHC has also filed a Motion to Strike with the Court. The motion is denied.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT